# EXHIBIT 1

# ARTICLES

## The Trouble with Trial Time Limits

NORA FREEMAN ENGSTROM*

*Civil trial rates are at an all-time low. Meanwhile, "trial time limits"—judicially imposed limits on the time litigants have to present their evidence at trial—seem to be at an all-time high. We have fewer trials than ever, yet we're taking aggressive steps to curtail the few that we've got. This Article zeroes in on this paradox. It excavates time limits' origins, tracks their rise, examines their administration, and raises deep questions about their fairness and utility. Trial time limits have, so far, been variously ignored or, alternatively, lauded, as a way to promote juror comprehension and as a tool to make trials cheaper and more efficient. Indeed, one court has gone so far as to call these restrictions "essential" to sensible docket management. This Article challenges that conventional story and cautions against time limits' regular or reflexive application. In so doing, this Article seeks to begin a broader inquiry into how the American civil trial of the twenty-first century is not only disappearing; the scattered trials that remain are also changing, in subtle and hard-to-quantify but profoundly important ways.*

### TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 935

I. TIME LIMITS IN CONTEXT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 939

    A. DEFINING THE TERM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 939

    B. A BRIEF HISTORY: FROM RARE TO COMMON AND FROM LENIENT TO STRICT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 941

    C. ESTIMATING THEIR PREVALENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . 945

* Professor, Associate Dean for Curriculum, and Deane F. Johnson Faculty Scholar, Stanford Law School. © 2018, Nora Freeman Engstrom. My thanks to Zachary D. Clopton, John Freeman, David Freeman Engstrom, Richard Friedman, Daniel Ho, Judge Jon O. Newman, Robert Rabin, Judith Resnik, Shanin Specter, and Charles Tyler for helpful comments on previous drafts. I am also grateful to the participants of the Stanford Law School Faculty Workshop, the 2017 Legal Ethics Schmooze at UCLA School of Law, and the Third Annual Civil Procedure Workshop at the Arizona James E. Rogers College of Law. Finally, I owe a large debt of gratitude to my research assistants, Nathan Werksman and Lora Nicole Allan, and the extraordinary and indefatigable staff at the Stanford Law School Library.

D.  OFFICIALLY ACCEPTED AND BROADLY ENDORSED. . . . . . . . . . . . . .    946

II.  TIME LIMITS IN PRACTICE: FOUR EXAMPLES . . . . . . . . . . . . . . . . . . . . . . .    948

A.  *MCKNIGHT V. GENERAL MOTORS*. . . . . . . . . . . . . . . . . . . . . . . . . . . . .    949

B.  *PIERCE V. COUNTY OF ORANGE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    950

C.  *BERTOLI V. CITY OF SEBASTOPOL* . . . . . . . . . . . . . . . . . . . . . . . . . . . .    951

D.  *AC V. AC*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    953

III.  THE ORIGINS OF TRIAL TIME LIMITS. . . . . . . . . . . . . . . . . . . . . . . . . . . .    954

A.  MANAGERIAL JUDGING AND EFFICIENCY ABOVE ALL ELSE . . . . . . . .    955

1.  Why the Upswing During the Downswing?. . . . . . . . . . .    958

B.  EPITOMIZE THE VIEW OF TRIAL-AS-DISEASE . . . . . . . . . . . . . . . . . . .    960

C.  JUST ANOTHER EXAMPLE OF JUSTICE BY THE NUMBERS . . . . . . . . .    961

D.  THE DECLINING TRIAL RATES THEMSELVES . . . . . . . . . . . . . . . . . . .    962

IV.  EVALUATING COSTS AND BENEFITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    962

A.  CLEAR BENEFITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    963

1.  Expands Jury Pool and Improves Jury Service. . . . . . . . .    963

2.  Arguably Better than Available Alternatives. . . . . . . . . .    964

B.  SOME COMMONLY CITED BENEFITS, SUSCEPTIBLE TO CRITIQUE . . . .    964

1.  Cost and Time Savings? . . . . . . . . . . . . . . . . . . . . . . . . . .    965

2.  Promotes Clarity and Improves Juror Comprehension? . .    966

3.  Resuscitates the Vanishing Trial? . . . . . . . . . . . . . . . . . . .    969

C.  DRAWBACKS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    970

1.  Difficult to Administer . . . . . . . . . . . . . . . . . . . . . . . . . . .    970

2.  Susceptible to Inequitable Application . . . . . . . . . . . . . .    972

3.  Impairs Procedural Justice . . . . . . . . . . . . . . . . . . . . . . . .    974

4.  Unprincipled, Unguided, Inconsistent, and Arbitrary. . . .    976

5.  Represents Potentially Ill-Advised Transfer of Power
from Advocate to Adjudicator and from Jury to Judge. . .    980

V.  A PATH FORWARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    981

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 987

INTRODUCTION

The "day-in-court ideal" has never been further out of reach.[1] Consider these statistics: About eighty years ago, in 1936, trials resolved roughly 20% of civil cases in federal court.[2] By 1990, though, only 4.3% of federal civil filings reached trial.[3] By 2000, that was cut in half to 2.2%.[4] And, in 2016, it was halved again to 1.1%.[5] Over the past twenty years, between 1997 and 2016, the number of civil trials in the nation's federal courts dropped 62%.[6] Another way to look at it: Federal courts conducted half as many civil trials in 2016 as they did in 1962, even while disposing of over five times as many civil cases.[7]

When you hone in on particular districts and also zero in on jury trials (rather than trials overall), the statistics look even starker. The eleven active judges that comprised the United States District Court for the District of Columbia presided over a combined seventeen jury trials in 2016.[8] The Northern District of California's twenty-one judges saw a combined forty-one civil jury trials in

---

1. Ortiz v. Fibreboard Corp., 527 U.S. 815, 846 (1999) (discussing the "day-in-court ideal" and "our 'deep-rooted historic tradition that everyone should have his own day in court'" (quoting Martin v. Wilks, 490 U.S. 755, 762 (1989)) (additional citation omitted)).

2. Stephen C. Yeazell, *The Misunderstood Consequences of Modern Civil Process*, 1994 WIS. L. REV. 631, 633 & n.3.

3. *Id.*

4. ADMIN. OFFICE OF THE U.S. COURTS, JUDICIAL BUSINESS OF THE U.S. COURTS, 2000 ANNUAL REPORT OF THE DIRECTOR tbl. C-4 (2000), http://www.uscourts.gov/sites/default/files/statistics_import_dir/c04sep00.pdf [https://perma.cc/7TN6-9JKU].

5. ADMIN. OFFICE OF THE U.S. COURTS, JUDICIAL BUSINESS OF THE U.S. COURTS, 2016 ANNUAL REPORT OF THE DIRECTOR tbl. C-4 (2016) [hereinafter TABLE C-4, 2016], http://www.uscourts.gov/sites/default/files/data_tables/jb_c4_0930.2016.pdf [https://perma.cc/NQP6-7HXY].

For a discussion of why the trial is vanishing, see NAT'L CTR. FOR STATE COURTS & STATE JUSTICE INST., CIVIL JUSTICE INITIATIVE: THE LANDSCAPE OF CIVIL LITIGATION IN STATE COURTS 37–38 (2015), https://www.ncsc.org/~/media/Files/PDF/Research/CivilJusticeReport-2015.ashx [https://perma.cc/6WSN-QYKZ]; *see also* ROBERT P. BURNS, THE DEATH OF THE AMERICAN TRIAL 82–111 (2009); ALEXANDRA LAHAV, IN PRAISE OF LITIGATION 14–15, 21–29 (2017). *See generally* Marc Galanter, *The Vanishing Trial: An Examination of Trials and Related Matters in Federal and State Courts*, 1 J. EMPIRICAL LEGAL STUD. 459 (2004); John H. Langbein, *The Disappearance of Civil Trial in the United States*, 122 YALE L.J. 522 (2012).

6. *Compare* TABLE C-4, 2016, *supra* note 5 (reporting that 2,781 civil cases went to trial in 2016), *with* ADMIN. OFFICE OF THE U.S. COURTS, JUDICIAL BUSINESS OF THE U.S. COURTS, 1997 ANNUAL REPORT OF THE DIRECTOR tbl. C-4 (1997), http://www.uscourts.gov/sites/default/files/statistics_import_dir/c04sep97.pdf [https://perma.cc/8LRX-L45T] (reporting that 7,359 civil cases went to trial in 1997).

7. The federal courts tried 5,802 civil cases in 1962, compared to 2,781 in 2016, and disposed of 50,320 civil cases in 1962, compared to 271,302 in 2016. *Compare* TABLE C-4, 2016, *supra* note 5 (listing 2016 data), *with* Galanter, *supra* note 5, at 462 tbl. 1 (listing 1962 data).

8. ADMIN. OFFICE OF THE U.S. COURTS, JUDICIAL BUSINESS OF THE U.S. COURTS, 2016 ANNUAL REPORT OF THE DIRECTOR tbl. C-4A (2016), http://www.uscourts.gov/sites/default/files/data_tables/jb_c4a_0930.2016.pdf [https://perma.cc/83C3-WCMD]. The above headcount excludes both senior and magistrate judges. The precise timeframe studied was the twelve-month period ending September 30, 2016. *Id.*

2016.[9] That year, the entire District of Nevada held ten civil jury trials, while astonishingly, the District of Alaska held none.[10]

At the state level, where the lion's share of civil litigation takes place, aggregate trial rates are lower still.[11] According to data maintained by the National Center for State Courts (NCSC), in 2015, the percentage of civil cases resolved by jury trial ranged from .05% to .5% in the twenty-one jurisdictions studied.[12] In these states, as on the federal level, the trend is sharply downward: In the studied jurisdictions, the number of civil jury trials dropped 33% during a recent four-year span from 2012 to 2015.[13]

In sum, as Professor John Langbein recently put it: "In American civil justice, we have gone from a world in which trials, typically jury trials, were routine, to a world in which trials have become vanishingly rare."[14] Further, there is broad consensus that this is a bad thing—that the trial's demise is a cause for concern, not celebration, and that "[t]he disappearance of the American trial presents a major crisis for the legal profession today."[15]

Given all this, one might assume that trial judges would not try to truncate the few scattered trials the system still supports. But evidence suggests otherwise. Even as we spill barrels of ink eulogizing the "vanishing trial," judges are increasingly, and, to my mind, inexplicably, using strict time limits to shorten the trial time of the small smattering of litigants who defy all odds to get their day in court.

These trial time limits—which I define as judicially imposed limits on the length of time the parties have to present their cases at either a bench or jury trial (or trial equivalent)—were unheard of prior to 1977, and they remained very rare throughout the 1980s. But they are now broadly accepted. They are becoming ever more common. And, as I will show, they are of tremendous practical, procedural, and institutional significance, affecting how thorough the trial is, how fair it appears, and even the fundamental reliability of its eventual outcome.

---

9. *Id.*

10. *Id.*

11. BURNS, *supra* note 5, at 85 (estimating that 98% of trials occur in the states).

12. 2015 Civil Caseloads—Trial Courts, NAT'L CTR. FOR STATE COURTS, http://www.ncsc.org/Sitecore/Content/Microsites/PopUp/Home/CSP/CSP_Civil [https://perma.cc/ETU2-3JG3] (last visited Apr. 10, 2018) (select "2015" under toolbar labeled "Select the Data Year," then select "Civil Jury Trials and Rates" from the toolbar labeled "Select Chart/Table"). The NCSC counts a proceeding as a "trial" as long as "the jury has been sworn, regardless of whether a verdict is reached." *Id.* (internal quotations omitted).

13. *Compare id.*, *with* 2012 Civil Caseloads—Trial Courts, NAT'L CTR. FOR STATE COURTS, http://www.ncsc.org/Sitecore/Content/Microsites/PopUp/Home/CSP/CSP_Intro [https://perma.cc/L8YE-43LJ] (last visited Apr. 10, 2018) (select "2012" from toolbar labeled "Select the Data Year," then select "Civil Jury Trials and Rates" from the toolbar labeled "Select Chart/Table"). *But cf.* Herbert M. Kritzer, *The Trials and Tribulations of Counting "Trials"*, 62 DEPAUL L. REV. 415 (2013) (suggesting that, for a number of reasons, we ought to interpret statistics showing declining trial rates with caution).

14. Langbein, *supra* note 5, at 524 (internal citation omitted). For the classic discussion, see generally Galanter, *supra* note 5.

15. Robert P. Burns, *What Will We Lose If the Trial Vanishes?* 1 (Northwestern Univ. Sch. of Law, Faculty Working Paper No. 5, 2011); *see, e.g.*, Stephen D. Susman & Thomas M. Melsheimer, *Trial by Agreement: How Trial Lawyers Hold the Key to Improving Jury Trials in Civil Cases*, 32 REV. LITIG. 431, 434 (2013) ("[W]e mourn the near-extinction of the jury trial . . . .").

Beyond that, while trial time limits are important in their own right, they also implicate wider debates about the structure, operation, and legitimacy of our contemporary system of civil litigation. In particular, they bring into stark relief perennial tradeoffs among efficiency, accuracy, and other values. They signal a reallocation of power between advocate and adjudicator, calling into question whether the "adversarial justice" model we hold dear actually prevails.[16] They raise tough questions concerning trial court discretion: How much is optimal? How much is too much? And, when we veer toward the latter, how do we know, and what should we do?[17] By undermining the dignity and eroding the "thoroughness" of contemporary trials, trial time limits implicate the "procedural justice" literature, made famous by Tom Tyler, Allan Lind, and others—and, when it comes to procedural justice, they highlight the provocative convergence of the modern trial and other mechanisms.[18] Finally, they lend support to Judith Resnik's "managerial judging" thesis, while also suggesting that her thesis, while arresting, does not go far enough.[19] In her seminal article, that is, Resnik implies that the phenomenon she describes only applies to the period "before and after the trial."[20] In Resnik's depiction, judges' newfangled management affects the pretrial period (as judges oversee pretrial discovery and actively push parties toward settlement), and it affects the post-trial period (as judges enforce robust remedial orders), but does not encroach on the period between opening and closing argument.[21] Filling in the picture, this study of trial time limits underscores that judges' sharp turn toward activism and improvisation has not just impacted the

---

16. *See infra* Section IV.C.5.

17. There is a rich literature mapping, critiquing, and defending judicial discretion. For a taste, see generally Robert G. Bone, *Who Decides? A Critical Look at Procedural Discretion*, 28 CARDOZO L. REV. 1961 (2007) and Richard L. Marcus, *Slouching Toward Discretion*, 78 NOTRE DAME L. REV. 1561 (2003).

18. *See infra* Section IV.C.3. For example, Robert Burns bemoans the "death of the trial," in part because the trial's demise "would mean the end of a place where *a citizen can effectively tell his own story publicly in a forum of power*." BURNS, *supra* note 5, at 113. But, while this is a valid concern, as we will see, trial time limits can get us to the same place via a different path, albeit without transparency, litigant acquiescence, or meaningful appellate review.

19. Judith Resnik, *Managerial Judges*, 96 HARV. L. REV. 374 (1982).

20. *Id.* at 377 ("Both before and after the trial, judges are playing a critical role in shaping litigation and influencing results.").

21. *Id.* at 378. In discussing this phenomenon, many others made the same assumption. *See, e.g.*, John H. Langbein, *The German Advantage in Civil Procedure*, 52 U. CHI. L. REV. 823, 859 (1985) ("To be sure, managerial judging in the pretrial process leaves adversary domination of the trial (especially jury trial) largely unaffected."); Todd D. Peterson, *Restoring Structural Checks on Judicial Power in the Era of Managerial Judging*, 29 U.C. DAVIS L. REV. 41, 63–76 (1995) (discussing the rise of managerial judging, but conceptualizing it as affecting only discovery, the pretrial process, and settlement). *But see, e.g.*, Richard L. Marcus, *Completing Equity's Conquest? Reflections on the Future of Trial Under the Federal Rules of Civil Procedure*, 50 PITT. L. REV. 725, 744–45 (1989) (discussing how judicial engagement impacts the trial itself); Robert F. Peckham, *A Judicial Response to the Cost of Litigation: Case Management, Two-Stage Discovery Planning and Alternative Dispute Resolution*, 37 RUTGERS L. REV. 253, 253 n.3 (1985) (discussing judicial engagement during the "two basic phases" of pretrial case management). For a thoughtful contemporary discussion, see generally Elizabeth G. Thornburg, *The Managerial Judge Goes to Trial*, 44 U. RICH. L. REV. 1261 (2010).

pretrial period or altered the post-trial period. It has taken hold in—and, in some instances, radically altered—the trial itself.

Notwithstanding their importance, however, trial time limits have received almost no attention from scholars and only limited attention from appellate courts.[22] This inattention is, in many ways, surprising. After all, the trial is the *most important* part of civil litigation. It's the dénouement; everything that comes before is just practice, prologue, or wind-up.[23] It is also the *most visible* component of the civil justice system. As Judge Jed Rakoff has put it: "A trial is the one place where the system really gets tested. Everything else is done behind closed doors."[24] How is it that we have said so little about a big change affecting the most consequential and also the most visible part of our system?

Yet the inattention is, on another level, explicable: As we shall see, appellate courts review time limits under an abuse of discretion standard and further demand that appellants challenging limits also show prejudice. This is such a deferential standard of review that reversals based on the imposition of time limits are *extraordinarily* rare and even careful appellate scrutiny is unusual.[25] Scholarly inattention, meanwhile, is less foreordained, but it is understandable, as it is just one chapter in a much larger story. Viewed through this wider lens, we see that we haven't paid much attention to trial time limits because we haven't paid much attention to the on-the-ground operation of trials, period. We know a lot about what happens before trials and after trials. We know quite a bit about what happens in lieu of trials, and we even know what is happening *to* trials (as seen through plunging trial rates). But we know remarkably little about the trial itself.[26]

So situated, this Article seeks not only to shed light on trial time limits: to show what they are, how they work, how they have grown, how they are affecting the civil (and, to a lesser extent, criminal) justice system, and to consider—and challenge—conventional wisdom concerning their value and utility. This Article also seeks to begin a broader and deeper inquiry into how the American civil trial

---

22. Before this, the most comprehensive scholarly treatments were a twenty-two-page essay published in the *University of San Francisco Law Review* in 1992, John E. Rumel, *The Hourglass and Due Process: The Propriety of Time Limits on Civil Trials*, 26 U.S.F. L. REV. 237 (1992), and an article published the following year, Patrick E. Longan, *The Shot Clock Comes to Trial: Time Limits for Federal Civil Trials*, 35 ARIZ. L. REV. 663 (1993). For a discussion of judicial inattention, see *infra* Section IV.C.4.

23. As one observer put it over a half-century ago: "The heart of the judicial process is the trial in court. All that precedes the trial is but preparation. All that follows is but the correction of error, if error there be." Sidney P. Simpson, *The Problem of Trial*, *in* DAVID DUDLEY FIELD CENTENARY ESSAYS 141, 142 (Alison Reppy ed., 1949).

24. Benjamin Weiser, *Trial by Jury, a Hallowed American Right, Is Vanishing*, N.Y. TIMES (Aug. 7, 2016), https://www.nytimes.com/2016/08/08/nyregion/jury-trials-vanish-and-justice-is-served-behind-closed-doors.html [https://nyti.ms/2aNeei4] (internal quotations omitted); *accord* Yeazell, *supra* note 2, at 644 (referring to trial as a "fish bowl").

25. *See infra* note 273 and accompanying text.

26. As Richard Marcus has observed: "Since 1938 the principal focus of reform and scholarship has been on pretrial matters, and relatively little attention has been directed to the actual decision-making process, ordinarily the trial." Marcus, *supra* note 21, at 788.

of the twenty-first century is not merely disappearing; the few trials that remain are also changing, in little noticed and poorly understood but profoundly important ways.

The remainder of this Article unfolds in five parts. Part I puts time limits in context, explaining what they are, how they arose, and how they are received. Part II then illustrates the phenomenon in more detail by describing four recent cases where these restrictions were imposed. With that foundation established, Part III steps back to examine the origins of this restriction—identifying the socio-legal factors that have contributed to limits' widespread utilization and acceptance. Part IV then pivots to offer a normative perspective. As noted, the conventional view is that trial time limits are salutary. Courts and commentators overwhelmingly accept that these restrictions save time; they save money; they promote clarity and, consequently, juror comprehension; and, in the words of two writers for the ABA Section of Litigation, they "should become the norm."[27] Part IV complicates that story. It reveals that trial time limits can be beneficial, but many benefits commonly associated with limits are grossly exaggerated—and these restrictions also come with sizable, and previously underappreciated, risks.

Finally, Part V draws on Part IV's cost-benefit analysis to chart a path forward. It offers courts and Rules Committees practical guidance as they seek to navigate competing demands. In so doing, Part V rejects a blanket ban on trial time limits. It accepts that at least *some* time restrictions are *sometimes* beneficial. But it simultaneously recognizes that time limits' current willy-nilly—and too often heavy-handed—imposition is unwise and unwarranted. Seeking to strike the proper balance between these two poles, Part V offers six recommendations aimed at preserving time limits' core advantages while mitigating the potential for abuse.

## I. TIME LIMITS IN CONTEXT

This Part begins and grounds the inquiry by putting trial time limits in context. Section I.A defines what trial time limits are and distinguishes them from other somewhat analogous à la carte mechanisms. Section I.B offers a brief history of the phenomenon, showing when and how trial time limits first arose, and how they have changed and expanded over the past several decades. Section I.C assesses time limits' current prevalence, and finally, section I.D canvasses conventional wisdom concerning their utility and propriety.

### A. DEFINING THE TERM

Trial time limits go by several names and can mean any number of things. As to the former, time-limited trials have been variously called "fixed-length"

---

27. John F. Ward & Michael J. Zinna, *Trial Time Limits*, *in* 6 BUSINESS AND COMMERCIAL LITIGATION IN FEDERAL COURTS § 65:30 (2016). For additional expressions of this consensus position, see *infra* notes 202–04 and accompanying text.

trials,[28] "compressed" trials,[29] "timed" trials,[30] "clock" trials,[31] and "abbreviated" trials.[32] I will typically use the term "trial time limits" or the "time-limited" trial for clarity. As to the latter, the time-limited trial is a concept that is rarely defined, creating some unnecessary practical and conceptual confusion. Here, I am referring to a judicially created and judicially imposed (not purely voluntary) restriction on the length of time one or both parties have to present evidence at either a bench or jury trial (or trial equivalent). I exclude other à la carte limits, such as those specifically regulating voir dire, opening statements or closing arguments, jury deliberation, and the examination or cross-examination of a particular witness. Close cousins of trial time limits, these à la carte restrictions are frequently imposed and sometimes oppressive.[33] They raise interesting questions, and they undeniably merit greater scrutiny. But, I do not analyze them here. I also put to the side other procedural economization techniques, such as the bifurcation of trials, ostensibly to save time,[34] as well as what some call the "prodding function"—that is, when a judge informally (but sometimes pointedly and publicly) admonishes a lawyer to "move along" or "finish the witness by lunch."[35] Lastly, I table the "short trial" and "summary jury trial." Although both share certain attributes with time-limited trials, both are also different in crucial respects.[36]

---

28. Michael L. Siegel, *Pragmatism Applied: Imagining a Solution to the Problem of Court Congestion*, 22 HOFSTRA L. REV. 567, 596 (1994).

29. Patricia Stambelos & Alex W. Craigie, *Under Pressure: The Four-Day Trial*, ACC DOCKET, Oct. 2012, at 44, 46, 48.

30. Applera Corp. v. MJ Research Inc., 389 F. Supp. 2d 344, 348 (D. Conn. 2005).

31. Maloney v. Brassfield, 251 P.3d 1097, 1102 (Colo. App. 2010).

32. Siegel, *supra* note 28, at 571 (discussing the abbreviated jury trial).

33. S*ee, e.g.*, Petta v. Cain, No. CIV.A. 01-3891, 2002 WL 1216619, at *6–7 (E.D. La. June 3, 2002) (denying petitioner's habeas corpus petition, where petitioner was sentenced to two concurrent terms of life imprisonment following a closing argument, where his lawyer was limited to twenty minutes); State v. Marshall, No. 22706, 2005 WL 2995122, at *7 (Ohio Ct. App. Nov. 9, 2005) (reviewing the trial court's decision to give the prosecutor and defense attorney two minutes each for closing argument); Dang v. State, 154 S.W.3d 616, 617 (Tex. Crim. App. 2005) (reviewing the trial court's decision to restrict defense counsel to a twenty-minute closing argument, where the defendant was charged with, and ultimately convicted of, capital murder and sentenced to life imprisonment—and where defense counsel's request for an additional three minutes was denied). For further discussion of restrictions on opening statements and closing argument, see Nora Freeman Engstrom, *The Diminished Trial*, 87 FORDHAM L. REV. (forthcoming 2018).

34. For more on bifurcation, see Jack B. Weinstein, *Routine Bifurcation of Jury Negligence Trials: An Example of the Questionable Use of Rule Making Power*, 14 VAND. L. REV. 831, 831 (1961) and Engstrom, *supra* note 33.

35. *See* Telephone Interview with Judge Jon O. Newman (Oct. 9, 2017) (on file with author) [hereinafter Newman Interview] (discussing this common but informal mechanism to promote trial efficiency).

36. The summary jury trial consists of a truncated trial (often of a day or half-day) where parties admit only condensed evidence before a small (often six-member) jury. Then, the jury comes to a verdict, but that verdict is typically advisory and geared toward settlement. *See* Peckham, *supra* note 21, at 273–74; Richard A. Posner, *The Summary Jury Trial and Other Methods of Alternative Dispute Resolution: Some Cautionary Observations*, 53 U. CHI. L. REV. 366, 372 (1986). A short trial, meanwhile, tends to be reserved for lower-value cases, limited to just one day, and accompanied by a waiver of appellate rights. *See* NAT'L CTR. FOR STATE COURTS, JURY TRIAL INNOVATIONS 83–85 (G. Thomas Munsterman et al. eds., 2d ed. 2006).

### B.  A BRIEF HISTORY: FROM RARE TO COMMON AND FROM LENIENT TO STRICT

Trial time limits were unheard of during most of the last century. However, they made a tentative appearance in the late 1970s, slowly gained acceptance in the 1980s through early 1990s, and then, in the late 1990s and 2000s, steadily gained popularity.[37] Over these decades, time limits have not only become more popular, they have also changed dramatically.

In the early years, courts proceeded cautiously. Some of this caution was evident in the type of case thought susceptible to limitation. In particular, the only cases initially thought amenable to time limits were those that were extremely complicated and really long—sometimes called "the protracted case."[38] Reflecting this conception, the first known time-limited trial was *SCM Corp. v. Xerox Corp.*, an antitrust battle royale before Judge Jon Newman in the U.S. District Court for the District of Connecticut, which pitted SCM against Xerox and involved some 30,000 factual allegations.[39] On October 10, 1977, when a beleaguered Judge Newman issued his novel order imposing a limit, the trial (which had started back in June) had already consumed the entire summer, and the transcript spanned 12,322 pages.[40] Yet, in all this time, plaintiff SCM had only managed to call two principal witnesses of the more than thirty it had on deck, leading Judge Newman to worry that, if he did not act, the proceeding would not be "kept within manageable proportions."[41]

---

37.  As of 1986, one commentator correctly observed: "Recent opinions establishing time limits on trials have broken the barrier of novelty, but strict limits are still rare." Roger W. Kirst, *Finding a Role for the Civil Jury in Modern Litigation*, 69 JUDICATURE 333, 337 (1986). Likewise, an appellate court noted in 1993 that the limits' propriety was a "matter of first impression" and that "[f]or well over a century, trial judges in the Commonwealth, have been able to control the flow of testimony at trials without the imposition of time limits." Chandler v. FMC Corp., 619 N.E.2d 626, 629 (Mass. App. Ct. 1993). As the years passed, however, numerous commentators have reflected on time limits' increasing prevalence. *See, e.g.*, United States v. Morrison, 833 F.3d 491, 504 (5th Cir. 2016) ("Imposing time limits during trial is a growing trend among district courts."); *Maloney*, 251 P.3d at 1101 (suggesting that timed trials are "increasing"); Mark W. Bennett, *Reinvigorating and Enhancing Jury Trials Through an Overdue Juror Bill of Rights: A Federal Judge's View*, 48 ARIZ. ST. L.J. 481, 500 (2016) (observing that "[h]ard time limits on the presentation of evidence in jury trials" is a "growing phenomenon"); William P. Frank et al., *Time Limits Imposed on the Case in Chief*, *in* 4 BUSINESS AND COMMERCIAL LITIGATION IN FEDERAL COURTS § 41:5 (2016) (observing that "more and more district courts are setting time limits on trial"); Andrew L. Goldman & J. Walter Sinclair, *Advisability and Practical Considerations of Court-Imposed Time Limits on Trial*, 79 DEF. COUNS. J. 387, 387 (2012) (discussing the "growing trend of imposing time limitations"); Martha K. Gooding & Ryan E. Lindsey, *Tempus Fugit: Practical Considerations for Trying a Case Against the Clock*, 53 FED. LAW. 42, 43 (2006) ("[C]ourts are increasingly . . . impos[ing] specific limits on the amount of time the parties are allotted to present their case at trial."); Rumel, *supra* note 22, at 237 (writing, as of 1992, that trial time limits were "[r]arely used in the past" but increasingly finding their "way into the courtroom"); Siegel, *supra* note 28, at 598 n.132 (writing in 1994 and calling the use of trial time limits a "growing trend").

38.  *E.g.*, Sec'y of Labor v. DeSisto, 929 F.2d 789, 795 (1st Cir. 1991) (noting that trial time limits "may be appropriate in protracted litigation"); MCI Commc'ns Corp. v. AT&T, 708 F.2d 1081, 1171 (7th Cir. 1983) (same).

39.  SCM Corp. v. Xerox Corp., 77 F.R.D. 10, 11 (D. Conn. 1977).

40.  *Id.* at 12.

41.  *Id.* at 13, 15. Of the decision, Judge Newman now recalls:

A second early exemplar, commenced two years later in 1979, was *MCI Communications Corp. v. AT&T*.[42] Another antitrust case, *MCI Communications* was "extraordinarily complex and multifaceted," and, even with time limits, its trial still managed to generate what the appellate court dubbed a "record of monstrous proportions."[43] Indeed, the trial record ran for a whopping 11,500 pages and was accompanied by over 1,000 exhibits.[44] In the same vein, a third early exemplar was *Westmoreland v. CBS*, a behemoth libel suit tried in the Southern District of New York in 1985.[45] There, presiding Judge Pierre Leval noted that the trial's "subject matter . . . was vast," "[e]ach side had exhibited a determination to win at whatever cost," and he imposed the restrictions in light of the "risk that, without the imposition of controls, the trial might run on inordinately."[46]

As the phenomenon has gained momentum, however, courts have started to impose time limits not just in this small subset of complex, protracted cases, but in the full run of litigation. In recent years, courts have started to experiment with time limits not just in civil suits, but also in criminal cases.[47] And on the civil side, it seems no substantive area (from personal injury,[48] to intellectual property,[49] to marital dissolution,[50] to custody battles,[51] to contract disputes,[52] to

---

As the case stretched on, I recall saying to the clerks: "I have got to set a time limit. Go get me the cases that say a judge can do this." They came back and said, "there aren't any." The only judicial decision was the wonderful line from Holmes's objection to collateral issues as "a concession to the shortness of life." Apparently, there was no reported decision of anyone ever imposing a trial time limit. But, I thought it had to be done so, I did it. I didn't think it was such a startling thing, but now . . . I see that it was.

Newman Interview, *supra* note 35.

42. 708 F.2d at 1171.

43. For the description, see *id*. at 1175 n.1 (Wood, J., concurring in part and dissenting in part). For the lower court decision, see MCI Commc'ns Corp. v. AT&T, 85 F.R.D. 28 (N.D. Ill. 1979).

44. *MCI Commc'ns Corp.*, 708 F.2d at 1175 n.1 (Wood, J., concurring in part and dissenting in part).

45. Westmoreland v. CBS Inc., 596 F. Supp. 1170 (S.D.N.Y. 1984).

46. Pierre N. Leval, *From the Bench:* Westmoreland v. CBS, 12 J. SEC. LITIG. 7, 7 (1985). Another early time-limited case was *Juneau Square Corp. v. First Wisconsin National Bank of Milwaukee*, 475 F. Supp. 451, 465 (E.D. Wis. 1979). There, the trial, notable for its complexity, lasted three months. Another was the case challenging the Raiders' move to Los Angeles. L.A. Mem'l Coliseum Comm'n v. Nat'l Football League, 726 F.2d 1381 (9th Cir. 1984). In that case, Judge Harry Pregerson allotted each side twenty hours after deciding "that the trial—with all its antitrust complexities—could go on forever if controls were not put into place." Mark Cursi, *Tick, Tick, Tick, Tick . . .; More Judges Are Imposing Time Limits on Trials to Ease Crowded Calendars. Some Counsel Who've Worked Under Them Say They're a Good Idea*, RECORDER, Apr. 4, 1991, at 6.

47. *See, e.g.*, United States v. Reaves, 636 F. Supp. 1575, 1580 (E.D. Ky. 1986); United States v. Cousar, No. 06-007, 2007 WL 4456798, at *2 (W.D. Pa. Dec. 16, 2007) ("Although it may be more common for a district court to impose time limits in a civil trial, setting time limits in a criminal trial is equally authorized.").

48. *See, e.g.*, Wahl v. N. Improvement Co., 800 N.W.2d 700, 702 (N.D. 2011).

49. *See, e.g.*, Apple, Inc. v. Samsung Elecs. Co., 920 F. Supp. 2d 1079, 1115 (N.D. Cal. 2013), *aff'd in part, rev'd in part*, 786 F.3d 983 (Fed. Cir. 2015), *rev'd and remanded*, 137 S. Ct. 429 (2016).

50. *See, e.g.*, *In re* Marriage of Vidal, 789 N.W.2d 436 (Iowa Ct. App. 2010).

51. *See, e.g.*, Doe v. Doe, 44 P.3d 1085, 1095–96 (Haw. 2002).

52. *See, e.g.*, Jackson v. Allstate Ins. Co., 785 F.3d 1193, 1203 (8th Cir. 2015); Sneberger v. Morrison, 776 S.E.2d 156, 163–66 (W. Va. 2015).

probate matters[53]) has been off limits. Now, courts impose limits when cases are complex—but also when they are straightforward.[54] Courts impose limits in trials with the highest profiles,[55] and in those with the smallest stakes.[56] Courts impose limits when the litigants are represented by top-flight counsel,[57] and they impose limits when a litigant proceeds pro se.[58] And, courts compress trials when the trial is a one-off, when the trial is on behalf of a class,[59] and even when the trial is a bellwether, being carefully watched as part of a larger litigation.[60] Indeed, some U.S. district court judges, by their own admission, impose trial time limits simply as a matter of course.[61]

Just as time limits have spread, they have also become more restrictive. Early on, just as it was thought that few cases were amenable to limits, in the rare instances when limits *were* imposed, the restrictions were notable for their generosity and flexibility—and, indeed, early appellate decisions approving of trial time limits stressed that "time limits should be sufficiently flexible to accommodate adjustment if it appears during trial that the court's initial assessment was too restrictive."[62] Illustrating this lenity, in *SCM Corp.*, that first antitrust case from 1977, Judge Newman limited the plaintiff to six months to present its evidence, "50% [m]ore than the top range of counsel's estimate."[63] Judge Newman further gave plaintiffs a safety valve. He explained that, if his six-month deadline created "a hardship not presently foreseeable," he would be open to giving plaintiffs additional time.[64] In another early antitrust case, the court limited the plaintiff to thirty-four days.[65] Similarly, in *MCI Communications*, described above, the

---

53. *See, e.g.*, Fink v. Williams, 291 P.3d 1140, 1143 (Mont. 2012).

54. *See, e.g.*, Maloney v. Brassfield, 251 P.3d 1097, 1099 (Colo. App. 2010) (noting that time limits were imposed in an automobile accident case, where the defendant admitted liability); State v. Landon, 388 P.3d 1157, 1158 (Or. Ct. App. 2016) (involving limits, where the driver contested his traffic citation "for speeding and for driving without required lighting").

55. *See, e.g.*, *In re* Katrina Canal Breaches Consol. Litig., No. 05-4182, 2012 WL 3815670, at *1 (E.D. La. Sept. 4, 2012); *In re* Welding Fume Prods. Liab. Litig., No. 1:03-CV-17000, 2010 WL 7699456, at *2 (N.D. Ohio June 4, 2010).

56. *See, e.g.*, Feiman v. City of Santa Monica, 656 F. App'x 870, 871 (9th Cir. 2016).

57. *See, e.g.*, Applera Corp. v. MJ Research Inc., 389 F. Supp. 2d 344, 348 (D. Conn. 2005) (justifying the use of time limits, in part, because "both sides were represented by sophisticated, experienced litigators").

58. *See, e.g.*, Allen-Pieroni v. Pieroni, No. 05-15-00774, 2016 WL 4039192, at *3 (Tex. Ct. App. July 26, 2016) (involving a time limit imposed on a pro se litigant).

59. *See, e.g.*, McClain v. Lufkin Indus., Inc., 519 F.3d 264, 282 (5th Cir. 2008).

60. *See, e.g.*, *In re* Welding Fume Litig., 2010 WL 7699456, at *2 ("From the very first MDL bellwether trial, the Court has imposed time limits upon the parties. The Court is now allowing each side a total of 30 trial hours . . . .").

61. *See, e.g.*, Guzman v. Latin Am. Entm't, LLC, No. 6:13-CV-41, 2014 WL 12599345, at *1 (S.D. Tex. July 2, 2014) ("The Court routinely imposes time limits at trial and will do so in this case."); Arthrocare Corp. v. Smith & Nephew, Inc., 310 F. Supp. 2d 638, 672 (D. Del. 2004), *aff'd in part*, 406 F.3d 1365 (Fed. Cir. 2005) (suggesting that the trial judge imposes trial time limits "in every civil case").

62. MCI Commc'ns Corp. v. AT&T, 708 F.2d 1081, 1171 (7th Cir. 1983).

63. SCM Corp. v. Xerox Corp., 77 F.R.D. 10, 15 (D. Conn. 1977). Plaintiff had estimated that they needed four months, and Judge Newman gave them six. *See* Newman Interview, *supra* note 35.

64. *SCM Corp.*, 77 F.R.D. at 15–16.

65. Juneau Square Corp. v. First Wis. Nat'l Bank of Milwaukee, 475 F. Supp. 451, 465 (E.D. Wis. 1979).

trial court allotted twenty-six days for each side's case-in-chief, and—like Judge Newman—stressed that even this generous restriction was subject to revision.[66] Emphasizing, "I have no interest in speed for the sake of speed," that "[i]t is my intention to allow each party sufficient time to present its case," and that "I want to make it very clear that nobody is being pushed to do anything that is inconsistent with what he perceives to be [in] the best interest of his client," the court underscored that the limit was "not absolute," there was "nothing absolutely hard and fast" about it, and it was "subject to change if events at the trial satisfy the court that any limit is unduly restrictive."[67]

By contrast, courts these days impose time limits that are, by all measures, draconian. For example, the Third Circuit recently denied a writ of mandamus sought by the defendants after the district court limited the *sixteen* named defendants to a combined 8.5 hours in what the Third Circuit described as a "complex case," where "many of the defendants may need to testify to present their own defenses."[68] A few years ago, in family law court in California, a judge set a rigid two-day cap on a marital dissolution case.[69] At 4:29 p.m. on the second day of trial, the judge declared, "This trial has ended," and exited the courtroom while an expert witness for the husband was on the stand and the husband's attorney was in the midst of asking him a question.[70] The judge did not return.[71] In another recent case, also involving marital dissolution, an Oklahoma judge imposed a limit of 125 minutes per party, even though the case involved knotty issues of "property division and debt responsibility, alimony, child custody, and child visitation."[72] As above, when the time allotted to the husband expired while he was on the stand, the court halted all further testimony.[73] Another example comes from Texas. There, a judge hearing a probate matter permitted the defendant only twenty-one minutes to present its case.[74] As we'll see is typical, the Texas Court of Appeals upheld the restriction as a valid exercise of the court's discretion.[75] Finally, in *Plaia v. Stewart Enterprises*, a Louisiana case, Lisa Plaia was

---

66. *MCI Commc'ns Corp.*, 708 F.2d at 1172. Further, the time limit affected only the case-in-chief, as "[t]he district court did not place a limit on the time allotted for rebuttal or surrebuttal." *Id.* at 1171.

67. *Id.* at 1172. Indeed, at trial, AT&T's counsel even acknowledged:

> "We are very pleased with the amount of time we have been given to deal with this kind of defense. We have no problems about that at all, and I am not trying to say that we are cutting it down because you are leaning on us. You are not leaning on us."

*Id.* at 1172 n.133 (quoting Tr. 6554–55). For the lower court decision, see MCI Commc'ns Corp. v. AT&T, 85 F.R.D. 28, 31–32 (N.D. Ill. 1979).

68. *In re* Baldwin, 700 F.3d 122, 129 (3d Cir. 2012). The court denied the writ, though, in a footnote, it not so subtly urged the district court to "re-examine the time-limit order to avoid the necessity of a retrial." *Id.* at 129 n.5.

69. *In re* Marriage of Carlsson, 77 Cal. Rptr. 3d 305, 307 (Ct. App. 2008).

70. *Id.* at 309.

71. *Id.*

72. Ingram v. Ingram, 125 P.3d 694, 696 (Okla. Civ. App. 2005).

73. *Id.* at 699.

74. Hansen v. JP Morgan Chase Bank, N.A., 346 S.W.3d 769, 777 (Tex. App. 2011).

75. *Id.*

catastrophically injured in 2010 while dropping her daughter off at daycare.[76] At a pretrial conference just before her personal injury trial was set to start, the trial judge imposed a hard two-week limit—justifying the restriction based on the fact she had "asbestos out the wazoo."[77] Then, once the trial was underway and with time ticking down, the trial judge cited the limit to justify her refusal to let Lisa's husband, Peter, testify concerning his loss of consortium claim—and then (with a cruel twist) subsequently granted a directed verdict for defendants on that claim because of Peter's failure to testify.[78]

C. ESTIMATING THEIR PREVALENCE

The above discussion reveals that, in the past few decades, time limits have gone from nonexistent, to extremely rare, to something more than that. But that begs the question: Just how prevalent have time limits become?

That, unfortunately, is an impossible question to answer, as neither the Federal Judicial Center nor the NCSC keeps tabs. But we do have a smattering of evidence—and the evidence paints a consistent portrait. It suggests that trial time limits are now popular and becoming ever more prevalent. In particular, New York University's Civil Jury Project has surveyed federal judges on the question. It reports that, of judges surveyed, fourteen out of twenty-one (67%) report having set trial time limits at some point.[79] I have conducted a survey of experienced plaintiffs' lawyers, and they report that, in their experience, the use of this mechanism is increasing.[80] As noted above, some federal judges, by their own admission, "routinely" impose time limits.[81] And, last but not least, I have conducted an admittedly crude quantitative study on Westlaw, gathering all published and unpublished state and federal cases that discuss the imposition of trial time limits.[82] That study, although hardly definitive, tends to confirm that the imposition of trial time limits is sharply on the rise.

---

76. No. 2014-CA-0159, 2016 WL 6246912, at *1 (La. Ct. App. Oct. 26, 2016).

77. *Id.* at *8.

78. *Id.* at *8–9. For the Court of Appeals of Louisiana, this was a bridge too far. Finding that the limits were "arbitrary and unreasonable," the court reversed and remanded for a new trial on the issue of damages. *Id.* at *17.

79. Stephen D. Susman & Richard L. Jolly, *An Empirical Study on Jury Trial Innovations* 6 & n.14 (2016) (Working Paper).

80. In February 2017, I circulated a survey to members of the Inner Circle of Advocates (an invitation-only group of the top one hundred plaintiffs' trial lawyers in the United States, all of whom have a "substantial number of jury trials") attending a winter gathering in San Francisco. I received twenty-two responses. Of those, the majority reported that trial time limits have become, in their experience, more common.

81. *See supra* note 61. In addition, the NYU Civil Jury Project reports that six out of twenty-one surveyed federal judges "regularly use the innovation." Susman & Jolly, *supra* note 79, at 6 & n.14.

82. *See* Trial Time Limit Cases, WESTLAW, https://1.next.westlaw.com (enter "adv: trial /6 time /1 limit! % 'speedy trial'" into the search bar; then click the jurisdiction toolbar and select "all federal" and "all state") (yielding 6,428 cases prior to 2018). I reviewed each case to see if trial time limits were actually imposed. From there, I keycited dozens of the cases the search identified to unearth any cases I had initially missed. Ultimately, this yielded a dataset of 302 cases, from 1977 to December 31, 2017.



### D. OFFICIALLY ACCEPTED AND BROADLY ENDORSED

Fueling this growth is a legal establishment that is increasingly—and seemingly unanimously—on record supporting these restrictions. This support is official and authoritative: In 1993, the Rules Committee amended Federal Rule of Civil Procedure 16 to authorize trial judges to impose, at any pretrial conference, an order "establishing a reasonable limit on the time allowed to present

---

As the text indicates, any empirical study that relies, for raw data, on the above databases must be viewed with caution, as Westlaw only captures the tip of any litigation iceberg. (This general limitation is apt to be especially pronounced in this particular context because trial time limits are bound to be imposed in pretrial orders, which are not typically published.) Beyond that, when it comes to *what* subset of material Westlaw captures, there is bound to be some variation over time and across space, confounding any effort to identify "trends." For a discussion of these and other difficulties, see David Freeman Engstrom, *The Twiqbal Puzzle and Empirical Study of Civil Procedure*, 65 STAN. L. REV. 1203, 1209 n.24, 1214–16 (2013). On the other hand, the observed uptick is, in some ways, more remarkable, given the well-known biases of what makes it into Westlaw. That is, many believe that judges are more likely to publish cases that "limn the boundaries" of their authority or "raise issues of first impression." *Id*. at 1215 & n.43. Consequently, we might expect that judges would have been more inclined to publish decisions imposing or reviewing trial time limits back when these restrictions were new, and when judges' authority to impose them was uncertain (which, as discussed at *infra* note 83, was true prior to a 1993 amendment to Rule 16). Over time, as trial time limits have lost any claim to novelty—and it has also become clear that restrictions are not only permissible but also reviewed on appeal pursuant to an *extremely* deferential standard (see *infra* notes 274–81)—the likelihood that any single imposition would result in a published decision or even generate an appeal would seemingly decline. *Cf*. CATHY D. PATRICK ET AL., S. DIST. OF TEX., JURY INNOVATIONS PROJECT: PILOT PROGRAM MANUAL 75, 78–81 (2009) (observing that time limits are frequently imposed but only rarely appealed). Thus, the above trend line, which reveals more and more Westlaw cases discussing or imposing time limits, to my mind, points to the increased incidence of the phenomena.

evidence."[83] (Prior to this 1993 amendment, federal judges who wanted to impose limits had to be more creative when identifying the source of their authority; they, variously, relied on their inherent authority or an amalgam of Federal Rule of Civil Procedure 1 and Federal Rules of Evidence 102, 403, and 611(a)(2).[84])

On the state side, a handful of jurisdictions have similarly amended their rules to authorize the restrictions.[85] Indeed, some courts' rules go further, to encourage—not just authorize—time limits' imposition.[86] And, even absent explicit authority, numerous state courts have, like their federal counterparts pre-1993, authorized or upheld trial time limits under an "inherent power" rationale.[87]

Others voice rhetorical support. The Federal Judicial Center's influential *Manual for Complex Litigation* arguably falls into this category. After observing that some lawyers "leave no stone unturned, resulting in trials of excessive length," the *Manual* goes on to advise that, where it appears the trial will be "excessively long," the trial judge should initially discuss the imposition of "voluntary, self-imposed limits."[88] "If this approach is not productive," however, the *Manual* instructs the judge to "consider" imposing various restrictions, including "grant[ing] . . . each party a specified number of hours for all direct and cross-examination."[89]

The American Bar Association (ABA) is in accord. Its Civil Trial Practice Standards, first promulgated in 1998, provide that "subject to the judge's ultimate responsibility to ensure a fair trial and to afford the parties a fair opportunity to be

---

83. FED. R. CIV. P. 16(c)(2)(O). In amending Federal Rule of Civil Procedure 16, the Advisory Committee explained that Rule 16 "supplements the power of the court to limit the extent of evidence under Rules 403 and 611(a) of the Federal Rules of Evidence." FED. R. CIV. P. 16 advisory committee's note to the 1993 amendments.

84. *See* Rumel, *supra* note 22, at 239–40 (writing prior to 1993 and outlining the sources of courts' claimed authority). Federal Rule of Evidence 611(a)(2) admonishes: "The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to . . . avoid wasting time." FED. R. EVID. 611(a)(2). Rule 403 empowers the court to exclude evidence if its "probative value is substantially outweighed by the danger of . . . undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403. Rule 102 instructs courts to construe the rules "to administer every proceeding fairly" and "eliminate unjustifiable expense and delay." FED. R. EVID. 102. Federal Rule of Civil Procedure 1 calls on courts to construe the rules to "secure the just, speedy, and inexpensive determination of every action and proceeding." FED. R. CIV. P. 1. Even before 1993, some federal courts' local rules specifically authorized the practice. *See, e.g.*, U.S. DIST. CT. R. D. MASS. 43.1(a)(1).

85. *See, e.g.*, ALASKA R. CIV. P. 16(c)(15) (authorizing the court to set "a reasonable limit on the time allowed for presenting evidence"); ARIZ. R. CIV. P. 16(k) (authorizing the imposition of "reasonable time limits on trial proceedings") (amended 2017); ARIZ. R. FAM. L. P. 77(B)(1) (same); HAW. R. CIV. P. 16(c)(15) (authorizing the court to set "a reasonable limit on the time allowed for presenting evidence"); MINN. R. CIV. P. 16.03(o) (same); NEV. R. CIV. P. 16(c)(13) (same); W. VA. R. CIV. P. 16(c)(15) (same).

86. Thus, a California Rule provides: "The trial judge *should* employ the following trial management techniques: . . . After consultation with counsel, set reasonable time limits." CAL. R. OF COURT Standard 2.20(b)(2) (emphasis added).

87. *See, e.g.*, *In re* Marriage of Ihle, 577 N.W.2d 64, 67 (Iowa Ct. App. 1998); Health Enrichment & Longevity Inst., Inc. v. State, No. 03-03-00578-CV, 2004 WL 1572935, at *5 (Tex. App. July 15, 2004).

88. FED. JUDICIAL CTR., MANUAL FOR COMPLEX LITIGATION (FOURTH) § 11.644 , at 127 (2004).

89. *Id.*

heard," the judge "should consider whether to . . . impose reasonable limits on trial presentation."[90] In recent years, the Standards have even gotten into the nitty gritty, describing the "methodology" for implementation, including matters such as who should keep time and how to alert the parties as to how much time in the trial remains.[91]

The Federal Judicial Center's *Benchbook for U.S. District Court Judges* says much the same. In a section on Civil Case Management, it exhorts judges: "Consider entering an order limiting the time for the trial, such as by allotting a specific number of trial hours to each party."[92]

Various reform projects are also on board. Texas's Jury Innovations Project Pilot Program Manual, for example, not so subtly notes that "appellate courts will look favorably upon judges who employ time limits to streamline difficult cases."[93] Meanwhile, New York University School of Law's Civil Jury Project has dubbed "imposing time limits on jury trials" the "most promising" jury trial innovation currently in use.[94]

Last but not least, numerous appellate courts explicitly approve of the practice. According to the Seventh Circuit, for example, "federal district judges not only may but must exercise strict control over the length of trials, and are therefore entirely within their rights in setting reasonable deadlines in advance and holding the parties to them."[95] A California appellate court has similarly declared: "It is incumbent upon trial judges to manage trials efficiently including [by] imposing reasonable time limits."[96]

## II. TIME LIMITS IN PRACTICE: FOUR EXAMPLES

As noted in Part I, trial time limits appear to be sharply on the rise. What do these limits look like?

My thorough canvass of available cases suggests that trials where time limits are imposed can be roughly divided into three broad categories: (1) cases that involve flexible and/or generous limits, where the restriction does not appear to alter the case's outcome or affect its procedural fairness, but where it helps primarily with scheduling; (2) cases where the time limit imposes a relatively weak constraint, such that it does not lead to the exclusion of otherwise admissible

---

90. CIVIL TRIAL PRACTICE STANDARDS § 12(b) (AM. BAR. ASS'N 1998).

91. *Id.* § 8(g) (1998, updated 2007).

92. FED. JUDICIAL CTR., BENCHBOOK FOR U.S. DISTRICT COURT JUDGES § 6.01, at 203 (6th ed. 2013).

93. PATRICK ET AL., *supra* note 82, at 81. That Texas Manual further provides:

"The imposition of trial time limits has consistently been approved by appellate courts as an appropriate exercise of judicial discretion . . . . In fact, there seems to be a building consensus that, especially in complex cases, a trial judge may have an affirmative obligation to employ *some* procedure to prevent unduly protracted trials."

*Id.* at 78–79 (quotation marks omitted; emphasis in original).

94. Stephen D. Susman, *Status of Jury Trial Innovations*, CIV. JURY PROJECT (Apr. 30, 2015), http://civiljuryproject.law.nyu.edu/scholarship/jury-trial-innovations/ [https://perma.cc/P9V9-4FKE].

95. Flaminio v. Honda Motor Co., 733 F.2d 463, 473 (7th Cir. 1984).

96. Shalant v. Girardi, No. B251785, 2015 WL 3958497, at *4 (Cal. Ct. App. June 29, 2015).

evidence or alter the trial's fundamental fairness—but does discipline counsel; and (3) cases where the limit is rigid and leads to the exclusion of otherwise admissible evidence, substantially interferes with counsel's independent strategic judgment, affects the fundamental dignity of the proceeding, or alters the case's ultimate outcome. Given data limitations, I do not—and cannot—make any definitive claim about the relative incidence of each case category in the broader case population, although, as noted, I observe a trend toward making time limits less flexible and more restrictive (that is, I observe a general uptick in Category 3 cases).[97]

In discussing *SCM Corp.* from 1977 and *MCI Communications* from 1979, I have offered portraits of cases from the first two categories. In both, the limits were flexible and generous, and the restrictions imposed, at most, a weak restraint. Below, Part II offers four examples of cases from the third category.

### A. *MCKNIGHT V. GENERAL MOTORS*

*McKnight v. General Motors* offers a relatively early example of trial time limits.[98] The case arose when, on March 5, 1987, Gary McKnight filed a civil rights action in the U.S. District Court for the District of Wisconsin pursuant to 28 U.S. C. § 1981 and Title VII of the Civil Rights Act of 1964, alleging that his employer, General Motors (GM), had terminated him unlawfully because of his race.[99] On October 3, 1988, the case was set for a jury trial—but prior to trial, Judge Myron L. Gordon decided, after "consultation with counsel for both parties," that the case warranted only twenty-five hours of trial time to be divided nearly equally.[100] Midway through the trial, though, Judge Gordon reconsidered. He decided that twenty-one hours was sufficient and shaved two hours from each side's allocation.[101]

Defending against McKnight's claims, GM failed to use its time judiciously. It spent most of its time cross-examining McKnight's witnesses—such that, by the time McKnight rested, GM had only forty-nine minutes to put on its four witnesses, an average of twelve minutes apiece.[102] Ultimately, GM moved for an additional hour, and Judge Gordon gave it half that. But even with that additional

---

97. To estimate how many cases fall within each category, I would first need to identify *all* state and federal cases where time limits have been imposed. (It would be insufficient to look just at the published or publicly available cases—or the cases where the limits generated challenges or appeals—since time limits that generate such challenges, and are therefore apt to be "visible" on Westlaw, are disproportionately likely to be Category 3 cases.) Given data limitations (particularly in state courts), identifying all these cases would be nearly impossible. From there, I would need to assess each limit alongside the broader trial, to see how restrictive it was and the effect that it had. Then, I would need to classify each case and, ultimately, tally the number of cases in each category. Note, the fact that I observe a general uptick in Category 3 cases is susceptible to interpretation. It might suggest that limits are, in fact, becoming more rigid. Alternatively, it might reflect the fact that, as courts' ability to impose limits is now firmly established, litigants only appeal restrictions that are particularly heavy-handed.

98. 908 F.2d 104, 114–15 (7th Cir. 1990).

99. McKnight v. Gen. Motors Corp., 705 F. Supp. 464 (E.D. Wis. 1989).

100. McKnight v. Gen. Motors Corp., 908 F.2d 104, 114–15 (7th Cir. 1990).

101. *Id.* at 115.

102. *Id.*

allocation, as Judge Richard Posner wryly noted in an appellate decision evaluating the restriction, seventy-nine minutes is "a very short time for four witnesses."[103] Indeed, with time ticking down, GM's witnesses literally ran to and from the witness stand "in a desperate effort to complete their testimony before time was called," turning a "federal trial into a relay race."[104] Eventually, a verdict—in the amount of $110,000 in compensatory damages and $500,000 in punitives—went to McKnight.[105]

GM appealed, complaining about this truncated time. On appeal, the Seventh Circuit agreed with GM insofar as it scolded the trial court for its decision to "impose arbitrary limits [and] enforce them inflexibly."[106] Nonetheless, the Seventh Circuit affirmed the judgment, reasoning that, because GM had neglected to show what it would have done had it been granted additional time, it had failed to preserve its objection.[107]

### B. *PIERCE V. COUNTY OF ORANGE*

A second example comes from California and, this time, involves aggregate litigation. The suit originated on October 18, 2001, when Fred Pierce, a pretrial detainee, initiated a class action in the U.S. District Court for the Central District of California against Orange County and the County's Sheriff.[108] Seeking relief under 42 U.S.C. § 1983, Pierce complained of unconstitutional conditions in the County's jails, including overcrowding, inadequate time to exercise, insufficient time to eat, and inconsistent access to religious services.[109] In 2003, the district court certified Pierce's class, comprised of some 180,000 men and women housed in five separate jails.[110] Substantial procedural wrangling and an exhaustive discovery process ensued, during which plaintiffs deposed sixty witnesses, hired multiple experts, conducted a survey of 440 inmates, and analyzed tens of thousands of pages of prison logs.[111]

After years of litigation—and just before a bench trial was set to start—the court notified the parties that it was imposing a trial time limit and, specifically, that it was restricting each side to three days.[112] Plaintiffs strenuously objected, complaining that they could not come close to putting on all the evidence necessary to prove the elements of their many claims in that circumscribed period.[113]

---

103. *Id*.
104. *Id*.
105. *Id*. at 107.
106. *Id*. at 115.
107. *Id*. The court explained: "If General Motors had preserved the issue of undue curtailment of trial time, we would reverse and order a new trial. But it has not preserved it, and this time its waiver is fatal." *Id*. For a general discussion of this prejudice prong in the trial time limit context, see *infra* note 269 and accompanying text.
108. Appellants' Opening Brief at 4, Pierce v. Cty. of Orange, 519 F.3d 985 (9th Cir. 2008) (No. 05–55829).
109. *Id*. at 4, 9.
110. *Id*. at 1.
111. *Id*. at 44.
112. *Id*. at 9; *Pierce*, 519 F.3d at 992.
113. Appellants' Opening Brief, *supra* note 108, at 45.

The court, however, held firm. According to plaintiffs, the restriction meant that they "were required to put on an entire class action . . . in less than fifteen hours."[114] In particular:

> This impossibly restrictive trial schedule resulted in plaintiffs being forced to prove their case with the testimony of less than twenty live witnesses, hustled on and off the witness stand, truncated cross-examination of defense witnesses, and little of the declaration and deposition testimony which told the full story of conditions in the jail.[115]

The trial concluded on December 8, 2004, and on April 27, 2005, the trial court issued its Findings of Fact and Law, ruling in favor of the County on all claims.[116] Plaintiffs appealed to the Ninth Circuit, complaining of the time limitation.[117] But nearly three years later, on March 24, 2008, the Ninth Circuit affirmed.[118] Reviewing the district court under the deferential abuse of discretion standard, the Ninth Circuit ruled that, although plaintiffs "objected to the time limitation," and although the case was, as plaintiffs insisted, "factually complex," plaintiffs did not merit relief because, like the appellant in *McKnight*, they had failed to "specify what evidence they would have presented if more time had been allotted."[119]

### C. *BERTOLI V. CITY OF SEBASTOPOL*

A third example involves a car wreck and its calamitous aftermath. On July 3, 2009, fifteen-year-old Julia Anna Bertoli was struck by a motorist while walking across the street in Sebastopol, a small town located in Sonoma County, California. Bertoli sustained massive head trauma and other injuries, and she ultimately filed suit, initiating claims against the California Department of Transportation and the City, among others, alleging that the intersection where she was hit was unreasonably dangerous.[120]

After a long pretrial period, on January 23, 2015, a jury trial commenced—although, as above, it was time-limited, with seventy-five hours initially allotted to Bertoli and seventy hours allotted to defendants.[121] The court imposed these restrictions, it said, to provide an "incentive to be diligent," in the interests of the parties, and in the interests of "trial witnesses, jurors and other litigants waiting in

---

114. *Id.* at 47.

115. *Id.* at 45.

116. *Id.* at 9.

117. *Id.* at 9–10.

118. *Pierce*, 519 F.3d at 993.

119. *Id.* After the 2008 appeal, parts of the case continued. For further procedural history, see Pierce v. Cty. of Orange, 761 F. Supp. 2d 915 (C.D. Cal. 2011).

120. Bertoli originally named nearly three dozen defendants; by the time of trial, only Caltrans and the City remained. Brief of Defendant-Respondent at 2–3, Bertoli v. City of Sebastopol, 2017 WL 318498 (Cal Ct. App. Jan. 18, 2017) (No. A145660).

121. Appellant's Opening Brief at 9, Bertoli v. City of Sebastopol, 2017 WL 4186711 (Cal. Ct. App. Aug. 5, 2016) (No. A145660). The court ultimately increased plaintiff's allotment to 78.5 hours. Bertoli had requested 146 hours, and the court, initially, had decided to allot Bertoli 85 hours but, on defendants' motion, revised that downward. Brief of Defendant-Respondent, *supra* note 120, at 8–10.

line to have their cases assigned to a courtroom."[122] Without the restrictions, the court explained, it was "convinced" that there would "be a tendency to offer cumulative evidence, irrelevant or less probative evidence, or that counsel may not be adequately prepared for the orderly progress of trial."[123] Ultimately, the trial lasted nine weeks, and the defendants prevailed.[124]

The time limit, it turned out, played a significant role, not only because it curtailed each side's time.[125] Rather, it appears from court documents that defendants actually weaponized the restriction and used it offensively. This was possible because, in administering the limit, the court counted all time against the "presenting, or offering party."[126] Thus, if the plaintiff was offering direct testimony from witness x, any objection to witness x's testimony counted against the plaintiff. Taking advantage of this, defendants raised a "barrage" of objections to plaintiff's witnesses—a remarkable 1,992 objections in all.[127] Defendants also demanded conferences to resolve many of these objections. In fact, Bertoli calculated that 10.7 of "her" hours were spent in these conferences, which consumed roughly 14% of all the time allotted to her.[128] Even the judge noted that all the objections and conferences were an "emotional circus" and that jurors were "already rolling their eyes."[129] Nonetheless, when keeping score, it appears the court counted roughly 16.2 hours of objections and conferences initiated by the defendants against Bertoli.[130]

Bertoli has appealed. As of March 2018, her appeal is pending before the Court of Appeal of California.[131]

---

122. Brief of Defendant-Respondent, *supra* note 120, at 10.

123. *Id.* at 12.

124. *Id.* at 22–23. The City was granted a nonsuit, and the jury returned a verdict in favor of Caltrans. Appellant's Opening Brief, *supra* note 121.

125. As it was, the plaintiff rested her case with only fifty-three minutes remaining for cross-examination—and before she had presented all "relevant evidence she would have presented otherwise." Appellant's Opening Brief, *supra* note 121, at 10.

126. *Id.* at 27.

127. *Id.* at 10, 25. For its part, respondent insists that "most of the defense objections and resulting sidebars were appropriate and could have been avoided had Bertoli better followed the rules of evidence and the court's orders." Brief of Defendant-Respondent, *supra* note 120, at 47.

128. Appellant's Opening Brief, *supra* note 121, at 25, 29.

129. *Id.* at 27.

130. This total combines plaintiff's estimate that 5.5 hours were spent making or responding to open-court objections plus the estimate that 10.7 hours were spent in conference. To be sure, it also appears that plaintiff's counsel could have done a better job efficiently organizing evidence and eliciting probative testimony. Brief of Defendant-Respondent, *supra* note 120, at 19–26, 31, 42–44 (quoting the court as stating, *inter alia*: "[d]espite daily notice of the time used by each party, and reminders by the court as to the perceived unwise use of time by [Plaintiff], the presentation of evidence by [Plaintiff] was ill-prepared, exhibiting the lack of diligence in preparation initially identified by this court, and which led to the imposition of these time limits").

131. Notice of Appeal, Bertoli v. City of Sebastopol, No. A145660 (Cal. Ct. App. July 15, 2015) http://appellatecases.courtinfo.ca.gov/search/case/dockets.cfm?dist=1&doc_id=2114554&doc_no=A145660&request_token=NiIwLSIkXkw8WzAtSCJNUE5JQDw6UVxfJyNOXzxTMCAgCg%3D%3D  [https://perma.cc/36K6-6U8P].

### D.  *AC V. AC*

A fourth and final example comes from the family court of Hawaii. There, on June 25, 2012, a mother and father convened to determine the custody of their two minor children—and, two months later, on August 23, 2012, a family court judge granted sole custody to the father.[132] The mother subsequently appealed, complaining (as above) about the imposition of strict trial time limits.

At the June 25th custody trial, Judge Lanson Kupau imposed a three-hour time limit amid swirling but uncertain evidence of spousal abuse and domestic violence.[133] The father, who opted to take the stand but did not call any additional witnesses, was able to present all of his evidence within this truncated period, using only fifty minutes. The children's mother had a much harder time.

The mother called five witnesses in all. Her first was a friend who had known her for fourteen years and "considered her a very good parent."[134] The second was a court Custody Evaluator, who, among other things, discussed the mother's past "bruises and black eyes," and testified that the father's former wife told the Evaluator that the father had physically abused *her* during their prior relationship.[135] Then, before the mother could call her third witness, the court warned: "We're going to finish this case at 4:30 today, so, Counsel, use your time wisely. Because if we don't get to an opportunity to hear from your client, that will be based upon your choice."[136] The mother then called her third witness, a neighbor, who testified that she was "a very good mother."[137] After the neighbor was excused, the court again jumped in to warn that the mother had only thirty-two minutes remaining.[138] Still, the mother's counsel called a fourth witness, a friend who testified, succinctly, that he had known the mother for approximately nine years, and that he, too, had observed bruises on the mother's body during the mother's relationship with the father.[139] Then, with twenty-five minutes remaining, the mother took the stand.[140] During her testimony, the court again cut in to tell counsel that he had "two minutes left."[141] At that point, counsel requested more time, leading to the following colloquy:

> COURT: . . . . [E]ach and every of the other witnesses I said we're running on a time crunch . . . . You still decided to call the other witnesses.

---

132.  AC v. AC, 339 P.3d 719, 720 (Haw. 2014).

133.  The family court judge decided to impose a time limit long before either the mother or the father had submitted their witness lists. *Id.* at 729. There is no evidence that the parties agreed to the restriction. *Id.* Nor does the record "reflect a rationale for imposing the limitation," *id.* at 734 (Pollack, J., concurring), although it seems likely that the court was set on ending the trial as scheduled because the father had traveled from Texas to attend, *id.* at 724 (majority opinion).

134.  *Id.* at 722.

135.  *Id.*

136.  *Id.* at 723.

137.  *Id.*

138.  *Id.*

139.  *Id.*

140.  AC v. AC, No. CAAP-12-0000808, 2013 WL 3927738, at *2 (Haw. Ct. App. July 30, 2013).

141.  *AC*, 339 P.3d at 743 (Pollack, J., concurring).

> COUNSEL: I understand, Your Honor. But each witness was important, and that witness had something to say about domestic violence.
>
> COURT: I understand. But you still—we still have the time constraints that we do have. You knew about them. So, as counsel, you were permitted to use time as you felt, uh, you needed to use them best. So I allowed you to do that. So continue. Use the rest of your time wisely.[142]

A few minutes later, as the mother recounted how infrequently she had been able to speak to her children while they were temporarily in their father's custody, the court called a halt to the direct examination.[143] Ten minutes later, as the father's counsel was conducting his cross, the court interjected and brought all testimony to a close.[144] In the midst of these colloquies, Judge Kupau acknowledged that the case was "very complex," and he also conceded that the restriction had prevented him from hearing additional evidence that he "wanted to hear."[145] But, he stuck to his guns.

The mother appealed, contending that, if she had had additional time, she could have further described the father's "extreme anger issues" and history of abuse, "including more than 50 alleged incidents of domestic violence, some of which included choking, suffocation, punching, slapping, 'body slamming,' and rape."[146] Unmoved, on July 30, 2013, in a Summary Disposition Order, a divided appellate court affirmed the lower court's judgment, emphasizing that the "family court has wide discretion in making its decisions."[147]

The mother again appealed. This time, a court reversed. In a rare opinion over-turning a trial court's imposition of time limits, the Hawaii Supreme Court ruled in 2014: "Given the important constitutional interests and the factual circumstances of this case, the court's enforcement of its time limit was not reasonable" as it deprived the parties of "a full and fair opportunity to present their case" and "prevented the family court from being able to determine the best interests of the children."[148] The court cautioned:

> Justice cannot always be achieved within the orderly environment of an assembly line. The importance of evidence is often not understood until all the evidence is heard. Thus, judges must not sacrifice their primary goal of justice by rigidly adhering to time limits in the name of efficiency.[149]

## III. THE ORIGINS OF TRIAL TIME LIMITS

Having seen what trial time limits are, how they operate, and that they are now almost universally accepted, Part III takes a step back to examine the deeper

---

142. *Id.* at 723 (emphasis omitted).
143. *Id.* at 723–24.
144. *Id.* at 735 (Pollack, J., concurring).
145. *Id.*
146. *Id.* at 731–32 (majority opinion).
147. AC v. AC, No. CAAP-12-0000808, 2013 WL 3927738, at *4 (Haw. Ct. App. July 30, 2013).
148. *AC*, 339 P.3d at 731–32.
149. *Id.* at 729 (citations omitted).

origins of this phenomenon and situate time limits in a broader historical and socio-legal framework. This Part shows that trial time limits are born of, are justified by, and also vividly illustrate larger currents and wider trends.

A. MANAGERIAL JUDGING AND EFFICIENCY ABOVE ALL ELSE

Time limits are first and most clearly born of the view that trial courts are overwhelmed and that extraordinary steps—including judicial innovation and experimentation—are justified to ease the crushing burden.

The view that courts are "too crowded" is pervasive and seemingly perennial.[150] It also has some connection to reality—or at least it did, at the time trial time limits made their debut. Between the 1960s and 1990s, Congress significantly expanded federal jurisdiction, established the Legal Services Corporation, created dozens of new causes of action, and facilitated aggregate action through 28 U.S.C. § 1947 and the modern-day Rule 23.[151] Civil caseloads grew apace. In the 1970s, the average annual rate of growth was 7.4%.[152] Then, from 1980 to 1985, it accelerated to 10.1%.[153] In all, from 1960 to 1986, civil case filings in U.S. district courts grew a stunning 398%.[154]

Further, it is not just that caseloads were growing. Even more relevant for our purposes, trials were getting longer. In the federal courts, there was a more than 50% increase in the average length of each trial from 1960 to 1988, from 2.2 days to 3.4 days.[155] At the same time, "long trials," which is to say civil trials that lasted for twenty or more days, were also up precipitously. Exhibiting this uptick, all of the nation's federal district courts saw ten such trials, total, in 1950—but then, numbers started to rise. By 1960, there were 23 such trials, then 32 in 1970, and 108 by 1980.[156] From 1950 to 1980, the number of long civil trials increased by an astonishing 1000%.

Congress responded by minting new judgeships—but not quickly enough. Between 1969 and 1983, a period when the civil caseload more than tripled, the

---

150.  *See* Arthur R. Miller, *The Pretrial Rush to Judgment: Are the "Litigation Explosion," "Liability Crisis," and Efficiency Clichés Eroding Our Day in Court and Jury Trial Commitments?*, 78 N.Y.U. L. REV. 982, 985–86, 985 n.4 (2003).

151.  *See* ARTHUR MILLER, FED. JUDICIAL CTR., THE AUGUST 1983 AMENDMENTS TO THE FEDERAL RULES OF CIVIL PROCEDURE: PROMOTING EFFECTIVE CASE MANAGEMENT AND LAWYER RESPONSIBILITY 5 (1984), https://www.fjc.gov/sites/default/files/2012/1983Amnds.pdf [https://perma.cc/8CVL-QUVU]; CASS R. SUNSTEIN, AFTER THE RIGHTS REVOLUTION: RECONCEIVING THE REGULATORY STATE 24–31 (1990); Thomas O. Main, *Procedural Constants: How Delay Aversion Shapes Reform*, 15 NEV. L.J. 1597, 1600 (2015); Resnik, *supra* note 19, at 396–98.

152.  Main, *supra* note 151, at 1600.

153.  *Id.*

154.  Patricia W. Hatamyar Moore, *The Civil Caseload of the Federal District Courts*, 2015 U. ILL. L. REV. 1177, 1178 (2015). Relieving some pressure, during this same general period, criminal filings were down on a per-judge basis from 113 filings per judge in 1960 to 77 in 1988. 1 FED. CTS. STUDY COMM., WORKING PAPERS AND SUBCOMMITTEE REPORTS 30 (1990).

155.  FED. CTS. STUDY COMM., *supra* note 154, at 33–34.

156.  Nora Freeman Engstrom, Civil Trial Data from 1980 to 2016 (2016) (unpublished manuscript) (on file with author) (compiling data from Tables C-8 and C-9 from the 1980 through 2016 Administrative Office of the United States Courts' *Director's Annual Reports*).



number of federal district judgeships increased by only 70%.[157] This mismatch meant that each judge's civil caseload increased considerably: There were nineteen new civil filings per judge per month in 1969, but by 1983, there were forty such filings.[158]

Faced with this onslaught, judges—quite understandably—came to believe that "our adversarial system has run amok"[159] and, like firefighters engulfed in flames, engaged in an all-out "rush to conquer case loads."[160] To do this, innovative approaches were needed—and, throughout the 1970s and 1980s, judges adopted them with gusto: Trained in docket management by the newly created Federal Judicial Center;[161] aided by new parajudicial personnel;[162] influenced by the ABA Action Commission to Reduce Court Costs and Delay;[163] emboldened by the 1983 amendments to the Federal Rules, which established a "principle of

---

157. Main, *supra* note 151, at 1600.

158. *Id.*

159. Peckham, *supra* note 21, at 265 ("I contend . . . that our adversarial system has run amok and that the movement toward judicial oversight represents an effort to preserve the best qualities of the system.").

160. Resnik, *supra* note 19, at 424.

161. Congress created the Federal Judicial Center in 1967, and soon thereafter, the Center "began to train judges in methods of efficient case management." Peterson, *supra* note 21, at 69.

162. Main, *supra* note 151, at 1606 (observing that, during this period, "there was a dramatic expansion in the staff of the judiciary—namely, magistrate judges, law clerks, and judges with senior status").

163. For more on the ABA Action Commission, see Peckham, *supra* note 21, at 259–60, 259 n.22.

management";[164] and shamed by new "productivity" reports, which, each month, cataloged how many cases each judge had terminated and how many remained[165]—over the period, judges got better at resolving cases faster. In fact, in a remarkable feat which stands as a testament to judges' ingenuity, resolve, and ability to adapt to changing circumstances, from 1969 to 1983, as caseloads swelled, federal judges doubled their "supply of terminations," and the median time from filing to disposition for a civil action in federal court barely budged.[166]

But, during that time, as judges got better at resolving more cases more quickly, there was a related, subtler, and arguably less salutary shift. This change powerfully affected not just what judges *did*—but, rather, how they *thought*. It reflected an evolution in judges' self-perception and their conception of the judicial role. During this period, many judges came to believe that "the system does not work; that *something* must be done to make it work; and that the only plausible solution to the problem is *ad hoc* procedural activism by *judges*."[167] As Judith Resnik explained in her classic 1982 article, "[m]any federal judges . . . departed from their earlier attitudes" characterized by "[d]isengagement and dispassion," and instead adopted "a more active, 'managerial' stance."[168] Judges started to claim more power for themselves, they started to exercise this newfound power in an improvisational, seat-of-the-pants kind of way, and they started to use this power to expedite the resolution and termination of cases.[169] Or, as the Federal Courts Study Committee matter-of-factly explained in a 1990 report: "[J]udges have developed techniques for rationing access to the court."[170]

Time limits exemplify and epitomize all of the above. Aimed at expediting adjudication and reflecting both judicial activism and *ad hoc* innovation, trial time limits are a product of this era, and they embody it.

As a historical matter, there is no doubt that trial time limits—which made their debut in the late 1970s—fit squarely within this heady period. It is further revealing that, in imposing early limits, judges explicitly referred to the factors above. Judge Newman, for example, justified his watershed decision, in part, on the "growing" caseloads in his district.[171] Nor is it a surprise that *many* judges, in

---

164. In 1983, the Rules Committee amended Rule 16, tweaked Rule 26, and overhauled Rule 11. MILLER, *supra* note 151, at 10, 15, 20–21, 33. In 1993, the Rules Committee further "embellished" Rule 16, encouraging even greater hands-on attention. Miller, *supra* note 150, at 1004.

165. FED. CTS. STUDY COMM., *supra* note 154, at 48–49.

166. Main, *supra* note 151, at 1612, 1619.

167. E. Donald Elliott, *Managerial Judging and the Evolution of Procedure*, 53 U. CHI. L. REV. 306, 309 (1986).

168. Resnik, *supra* note 19, at 376. Or, as Judge Peckham put it, over the period there had been a radical transformation of "the federal judge from a passive umpire to managerial activist." Peckham, *supra* note 21, at 254.

169. *See* Thornburg, *supra* note 21, at 1294; *see also* Resnik, *supra* note 19, at 431.

170. FED. CTS. STUDY COMM., *supra* note 154, at 47.

171. SCM Corp. v. Xerox Corp., 77 F.R.D. 10, 14 (D. Conn. 1977).

imposing or affirming early limits, pointed to "crowded dockets,"[172] "swollen . . . caseloads,"[173] and the growing "volume of litigation,"[174] which, they said, "threatened . . . the ability of the courts to render service to the public,"[175] and gave judges not just the ability but the "responsibility" to control "the amount of trial time allotted to litigants."[176] Said the Fifth Circuit: "[T]he courts of this country labor under heavy caseloads, and in order to accommodate these caseloads some concessions to expediency are necessary."[177] Judge William Bertelsman—the first judge to impose limits in a criminal case—perhaps captured the zeitgeist best. Writing in 1986, Bertelsman explained: "Since traditional methods of handling the caseload are breaking down, it is the obligation of the courts to adopt more novel approaches. Judges and courthouses cannot be multiplied indefinitely. Innovative approaches to processing complex litigation are the order of the day."[178]

### 1. Why the Upswing During the Downswing?

At the same time, the history recounted above presents a puzzle: As noted above, trial time limits were first imposed in the late 1970s just as caseloads were surging and "long" trials (that is, trials of over twenty days) were growing exponentially. Thus, as initially imposed, trial time limits arguably *were* a reasonable and reasonably targeted response to extraordinarily challenging conditions.

But trial time limits *really* took hold in the late 1990s and 2000s. And civil filings in the federal system, which more than doubled between 1969 and 1983, have experienced little, if any, growth over the ensuing years.[179] These days, the average U.S. district court judge has seen some increase in his criminal docket, but he has roughly the same number of "weighted" civil cases as he had back in 1986.[180] Meanwhile, in recent years, state courts have not seen a plateau; to the contrary, they have seen a drop. Since 2006, state court caseloads have fallen 16%, which represents a loss of about sixteen million cases.[181]

---

172. Juneau Square Corp. v. First Wis. Nat'l Bank of Milwaukee, 475 F. Supp. 451, 465 (E.D. Wis. 1979) (discussing "crowded dockets"); *accord* Flaminio v. Honda Motor Co., 733 F.2d 463, 473 (7th Cir. 1984) (same).

173. McKnight v. Gen. Motors Corp., 908 F.2d 104, 115 (7th Cir. 1990) (declaring that "in this age of swollen federal caseloads district judges must manage their trials with an iron hand").

174. Leval, *supra* note 46, at 8.

175. *Id.*

176. *Flaminio*, 733 F.2d at 473 ("[I]n this era of crowded district court dockets federal district judges not only may but must exercise strict control over the length of trials . . . ."); *Juneau Square Corp.*, 475 F. Supp. at 465 (discussing courts' "responsibility to exercise reasonable control over the amount of trial time allotted to litigants").

177. Sims v. ANR Freight Sys., Inc., 77 F.3d 846, 849 (5th Cir. 1996).

178. United States v. Reaves, 636 F. Supp. 1575, 1579–80 (E.D. Ky. 1986).

179. "[A]fter 1985, civil caseloads quit growing." Main, *supra* note 151, at 1624; *see also* Moore, *supra* note 154, at 1182–83.

180. Moore, *supra* note 154, at 1181–82, 1193, 1235. For a discussion of "weights," see *id.* at 1189–91.

181. RICHARD SCHAUFFLER, NAT'L CTR. FOR STATE COURTS, TRENDS IN STATE COURTS: CLOSE UP: THE RISE AND FALL OF STATE COURT CASELOADS 1 (2017).





Likewise, long federal civil trials (that is, trials of twenty or more days) have declined sharply (though, of course, there's a chicken-and-egg problem, as part of the observed drop may well be caused by the increased imposition of trial time limits). Still, 1980—with its 108 protracted trials—was, with the benefit of hindsight, a high-water mark and a turning point. By 1990, the nation's federal district courts were down to a total of eighty-five long trials, followed by forty in 2000, fifteen in 2010, and a mere thirteen in 2016.[182] Out of the 677 federal district judges in 2016, only 1.9% had to deal with such a case.[183] Any crisis of protracted trials is, thus, a distant memory.

Other metrics are in accord. For example, it is not that federal judges are busy on the bench—but just doing other things. To the contrary, "bench presence," that is, the total courtroom hours per federal court judge, is also down—with a 10% drop between 2008 and 2013.[184] Nor is delay a bigger problem than it used to be. A recent study reports that the median disposition time for a civil case in

---

182. Caseload Statistics Data Tables, U.S. COURTS, http://www.uscourts.gov/statistics-reports/ caseload-statistics-data-tables [https://perma.cc/4JNW-3TXN] (under the toolbar "Search for Table Number" enter "T-2" and then click "Apply") (displaying data since 1997); *accord* ADMIN. OFFICE OF THE U.S. COURTS, JUDICIAL BUSINESS OF THE U.S. COURTS, ANNUAL REPORTS OF THE DIRECTOR (data prior to 1997 found in Tables C-8 and C-9) (on file with the author).

183. ADMIN. OFFICE OF THE U.S. COURTS, JUDICIAL BUSINESS OF THE U.S. COURTS, ANNUAL REPORT OF THE DIRECTOR tbl. 3 (2016), http://www.uscourts.gov/statistics-reports/us-district-courts-judicial-business-2016 [https://perma.cc/SB8R-Q7TK] (reporting that there were 677 authorized judgeships in 2016).

184. Jordan M. Singer & William G. Young, *Bench Presence 2014: An Updated Look at Federal District Court Productivity*, 48 NEW ENG. L. REV. 565, 566 (2014).

federal court has remained fairly stable since 1986, vacillating between 7 and 9.5 months.[185]

Thus, if time limits really are a response to "crowded dockets," it seems that judges' enthusiasm for the mechanism has surged just as the objective need for them has waned. Further confounding matters, there is some (albeit limited) evidence federal court judges are more likely to impose time limits than their state-court counterparts.[186] This, too, is odd because federal court judges in general have comparatively smaller caseloads and greater resources.[187]

### B. EPITOMIZE THE VIEW OF TRIAL-AS-DISEASE

Second, trial time limits spring from the view of trial as a mistake, "failure,"[188] or "pathological event."[189] These days, as many scholars have noted, judges favor not trials, but settlement.[190] There is, as Marc Galanter and Angela Frozena have noted, "an ideology . . . that trials are expensive and wasteful."[191] There is a sense that the trial is not the natural "culmination of the proceedings" but rather a "doomsday machine—a demanding and risky thing, unwelcome to all the players (including the judge), that will occur if the matter is not resolved by settlement or

---

185. Moore, *supra* note 154, at 1199.

186. Evidence on this point comes from my February 2017 survey of members of the Inner Circle, discussed at *supra* note 80. Of those with a view, the vast majority of surveyed Inner Circle respondents reported that state and federal court judges differ on their willingness to impose trial time limits. Articulating a widely shared sentiment, one litigator explained: "In my experience, Art. III judges are most likely to impose time limits, many of which can apply to all aspects of the trial. It's rarer in state court." Another advocate, who practices mostly in Tennessee, explained that trial time limits are imposed "*much more frequently in federal court.*" A third noted: "Federal judges with their unlimited resources, started and are most likely to use time limits." And, a fourth chimed in: "In state court, we never have trial limits . . . . Get limits in every federal court trial . . . ."

187. According to data maintained by the NCSC, in 2015, there were 72 million cases for 21,179 state court judges. NAT'L CTR. FOR STATE COURTS, *supra* note 12. This suggests that there were 2,663 incoming cases for each state court judge. By comparison, the Administrative Office for the federal courts reports that there were 551 total filings per federal judge in 2015. *See* U.S. COURTS, UNITED STATES DISTRICT COURTS–NATIONAL JUDICIAL CASELOAD PROFILE (2015), http://www.uscourts.gov/ sites/default/files/data_tables/fcms_district_profiles_december_2015.pdf [https://perma.cc/3WRM-FYEL].

188. Judith Resnik, *Trial as Error, Jurisdiction as Injury: Transforming the Meaning of Article III*, 113 HARV. L. REV. 924, 925 (2000) (quoting a federal judge stating "that he regarded the eight percent trial rate as evidence of 'lawyers' failure'"); *accord* Samuel R. Gross & Kent D. Syverud, *Getting to No: A Study of Settlement Negotiations and the Selection of Cases for Trial*, 90 MICH. L. REV. 319, 320 (1991) ("A trial is a failure.").

189. Judith Resnik, *Many Doors? Closing Doors? Alternative Dispute Resolution and Adjudication*, 10 OHIO ST. J. ON DISP. RESOL. 211, 261 (1995); *accord* Judith Resnik, *Migrating, Morphing, and Vanishing: The Empirical and Normative Puzzles of Declining Trial Rates in Courts*, 1 J. EMPIRICAL LEGAL STUD. 783, 811–14 (2004) (compiling judges' "anti-trial rhetoric").

190. Articulating this view, a judge remarked in 1976: "[M]ost cases . . . are better disposed of, in terms of the highest quality of justice, by a freely-negotiated settlement, than by the most beautiful trial that you can preside over." Hubert L. Will, *Judicial Responsibility for the Disposition of Litigation*, *in Proceedings of Seminar for Newly Appointed United States District Judges*, 75 F.R.D. 117, 123 (1976).

191. Marc Galanter & Angela M. Frozena, *A Grin Without a Cat: The Continuing Decline & Displacement of Trials in American Courts*, 143 DÆDALUS, J. OF THE AM. ACAD. OF ARTS & SCI. 115, 121 (2014); *accord* Stephen B. Burbank & Stephen N. Subrin, *Litigation and Democracy: Restoring a Realistic Prospect of Trial*, 46 HARV. C.R.-C.L. L. REV. 399, 399 (2011) (describing how trials came to be seen as "wasteful").

dismissal."[192] Of course, if the trial is seen as a pathological event—or, as Samuel Gross and Kent Syverud have put it, a "disease"—it makes sense that, just as one wants to recover from an illness as quickly as one can, one should get the trial over and done with as expeditiously as possible.[193]

### C. JUST ANOTHER EXAMPLE OF JUSTICE BY THE NUMBERS

Third, trial time limits have their roots in our broader system of "justice by the numbers," and one may conceptualize trial time limits as merely a specific application of a widely accepted principle: Limits must be, and typically are, imposed on litigants.

Strict limits are indeed seen in *many* aspects of litigation: In the trial court, rules govern when a case must be filed and how much time the defendant has to file an answer.[194] During the pretrial phase, rules specify how many interrogatories a party may propound and the number of witnesses a litigant can depose (as well as the precise length of each deposition).[195] There is even a rule—Rule 6—that provides specific guidelines for how to interpret the Rules' specified limits.[196] Appellate litigation is similarly rife with restrictions. Briefs are limited both in length (thirty pages for principal briefs and fifteen pages for replies) and word count (13,000 words for principal briefs and 6,500 for replies).[197] Arguments are similarly circumscribed. In the Seventh Circuit, for example, many cases are allotted a mere "10 to 20 minutes per side."[198]

Beyond the conceptual similarity, there is evidence that early supporters of trial time limits viewed the restrictions through this lens—as just another mechanism to discipline counsel and streamline the presentation of evidence. Thus, Judge Pierre Leval, who, recall, imposed an early trial time limit in

---

192. Galanter & Frozena, *supra* note 191, at 126.

193. Samuel R. Gross & Kent D. Syverud, *Don't Try: Civil Jury Verdicts in a System Geared to Settlement*, 44 UCLA L. REV. 1, 3 (1996) (describing the view that "[t]rial is a disease, not generally fatal, but serious enough to be avoided at any reasonable cost" (footnote omitted)).

194. *See, e.g.*, FED. R. CIV. P. 12(a)(1)(A)(i) (specifying that an answer is to be filed "within 21 days after being served with the summons and complaint"); CHARLES ALAN WRIGHT ET AL., 4 FEDERAL PRACTICE AND PROCEDURE § 1056 (Thomson Reuters ed., 2015) (discussing statutes of limitations).

195. FED. R. CIV. P. 33(a)(1) (limiting the number of interrogatories); FED. R. CIV. P. 30(a)(2)(A)(i), 30(d)(1) (same for depositions). Even outside of formal rules, many courts impose "calendar limits" on discovery, mandating that the parties complete all discovery by a given date. *See* Newman Interview, *supra* note 35 ("Trial court judges routinely set time limits on discovery, in the pretrial stage, as a part of trial management.").

196. *See* FED. R. CIV. P. 6.

197. FED. R. APP. P. 32(a)(7).

198. DONALD J. WALL, COUNSEL CIRCUIT EXEC., PRACTITIONER'S HANDBOOK FOR APPEALS TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT 162 (2017), http://www.ca7.uscourts.gov/forms/Handbook.pdf [https://perma.cc/PA9W-5P7M]. Cutting things further, in the Seventh Circuit, as well as in most other circuits, some appeals are resolved without any oral argument whatsoever. *See id.* at 12, 161; *see also* D.C. CIRCUIT, HANDBOOK PRACTICES AND INTERNAL PROCEDURES UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT 50 (2017), https://www.cadc.uscourts.gov/internet/home.nsf/Content/VL%20-%20RPP%20-%20Handbook%202006%20Rev%202007/$FILE/HandbookJanuary2017WithTOCLinks22May2017.pdf [https://perma.cc/U9V7-ASHX] (describing Rule 34(j) dispositions).

*Westmoreland v. CBS*, justified his decision, in part, by analogizing to appellate litigation where "[i]t is common practice in the appeals courts to limit the number of pages of briefs, as well as the time for argument."[199]

### D. THE DECLINING TRIAL RATES THEMSELVES

Finally, it appears that declining trial rates, so widely observed and broadly lamented, have paradoxically contributed to trial time limits' growth. Granted, there is an Alice-in-Wonderland quality to this last observation: As trials become scarcer, it seems strange to try to truncate the few we have left. Yet, in two ways, the scarcity of trials appears to fuel trial time limits' popularity.

First, as Marc Galanter and Angela Frozena have observed: "It may . . . be the case that as judges preside over fewer trials, each additional trial seems a weightier addition."[200] The rarer trials are, the less patience we have for the few that remain.

Second, other courts and commentators have publicly *touted* trial time limits as the *solution* to the "vanishing trial" problem—a point I return to below.[201] The thinking goes like this: Savvy litigants, at least implicitly, compare trials (Door Number 1) to other available dispute resolution mechanisms, such as settlement, arbitration, mediation, summary trials, and even voluntary dismissals (Door Number 2). To the extent that trials are seen as unduly cumbersome, time consuming, and expensive, more litigants will rationally opt for Door Number 2. But, if trials are streamlined, we might see renewed interest in Door Number 1. According to these commentators, then, trial time limits are just what is needed to "stem the tide of America's disappearing civil jury trials."[202]

### IV. EVALUATING COSTS AND BENEFITS

To this point, courts and commentators have viewed trial time limits favorably. According to one scholarly article: "[C]ourts and commentators overwhelmingly believe that trial time limits benefit litigants, juries, and the public."[203] Indeed, one trial court has gone so far as to call limits "essential" to sensible docket management.[204]

Part IV asks whether this acclaim is warranted. Section IV.A discusses trial time limits' undeniable advantages. Section IV.B then points out that some advantages widely thought to accompany trial time limits do not hold up under scrutiny. Finally, section IV.C identifies some clear, and heretofore

---

199. Leval, *supra* note 46, at 8. For more on *Westmoreland v. CBS*, see *supra* note 46 and accompanying text.

200. Galanter & Frozena, *supra* note 191, at 127.

201. *See infra* note 239 and accompanying text.

202. Susman & Jolly, *supra* note 79, at 2–3; *accord* Reagan W. Simpson & Cynthia A. Leiferman, *Innovative Trial Techniques: Timesaving Litigation Devices or Straight Lines to Disaster?*, 26 BRIEF 21, 22, 51 (1996) (declaring that time limits ought to "seriously be considered by litigants, lawyers, and jurists as a way to preserve the advocacy system and the profession of trial lawyers").

203. Rumel, *supra* note 22, at 250. For a rare expression of skepticism, see Thornburg, *supra* note 21.

204. Evans v. Port Auth., 246 F. Supp. 2d 343, 351 (S.D.N.Y. 2003).

underappreciated, drawbacks. At the end of the day, Part IV's extended cost-benefit analysis does not definitively *prove* that time limits' costs exceed their benefits. Balancing costs and benefits is a tricky business in the best of circumstances; it is particularly difficult where data are partial and fragmentary. But, in showing that many of time limits' ostensible advantages are doubtful, or at least exaggerated, whereas many associated costs are large and have been mostly overlooked, Part IV's analysis, at the very least, complicates the conventional story.

A.  CLEAR BENEFITS

Trial time limits have some advantages. First, they expand the jury pool and almost certainly improve jury service. Second, for judges determined to restrict trials, they may be better than some available alternatives.

1.  Expands Jury Pool and Improves Jury Service

First, to the extent trial time limits truncate trials, it seems clear that they expand the size and increase the diversity of the juror pool because more individuals are available to serve as jurors in shorter trials than in longer ones. Relevant here, in the early 1980s, researchers at the Federal Judicial Center (FJC) compared jurors in long trials (more than twenty days) and short trials (one to six days) and found, consistent with expectations, that jurors in the former tended to represent just a subset of the American population; compared to the population as a whole, long-trial jurors were substantially more likely to be retired or unemployed and substantially less likely to have a college education.[205]

Relatedly, trial time limits benefit jurors themselves by giving them a better and firmer sense of how long jury service will last. As one court has explained:

> From a jury's point-of-view time limits are especially [beneficial]. While judges wax eloquent on the joys of jury service, most jurors approach the prospect with the enthusiasm of a French peasant for the corvée. One of the few ameliorating comforts a court can offer reluctant jurors is the assurance of a reasonably defined schedule around which they can plan their lives. Time limits accomplish this.[206]

Indeed, the same FJC study referenced above found that jurors' articulated willingness to serve as a juror in a subsequent trial was marginally diminished if the length of initial service "greatly exceeded their expectations."[207]

205.  Joe S. Cecil et al., Fed. Judicial Ctr., Jury Service in Lengthy Civil Trials 1, 9, 11–13, 28, 33 (1987). The relevant trials took place between 1976 and 1979. The surveys were conducted in 1981. *Id.* at 11–14. Commentators have also seized on this benefit. *See, e.g.*, Stambelos & Craigie, *supra* note 29, at 48 (suggesting that "compressed" trials increase the pool of available jurors).

206.  Matton v. White Mountain Cable Constr. Corp., 190 F.R.D. 21, 25 (D. Mass. 1999); *see also* Bennett, *supra* note 37, at 499.

207.  Cecil et al., *supra* note 205, at 25. That said, most jurors expressed an openness to an encore performance, and, as the text indicates, even when jurors were unpleasantly surprised by the length of service, the relevant drop was only marginal: Of jurors who said that the length of service "greatly exceeded their expectations," an impressive 75% expressed a willingness to serve again, whereas, of

2. Arguably Better than Available Alternatives

Second, for a judge determined to prune a party's presentation of evidence, trial time limits are arguably preferable to available alternatives—particularly if a court sees the alternative as stringent but piecemeal limits on the admission of evidence via Evidentiary Rule 403 or 611(a)(2).[208] Thus, as one commentator has noted: "With a time limit, the court is out of the business of micromanaging the trial for the parties. The parties are left to choose for themselves how best to spend their time."[209] Much like cap-and-trade is thought to limit greenhouse gas emissions in a way that is fairer, more efficient, and ultimately more sensible than a series of discrete regulations keyed to each particular source of emissions, trial time limits empower lawyers—those who know the case best—to decide in an ordered and organized way what should stay and what should go without repeated judicial interference.[210] To be sure (and it bears emphasis), it is not at all clear that the alternative to a compressed trial really is granular micromanagement via Evidentiary Rule 403 or 611(a)(2). (Management, rather than micromanagement, remains an option.) Nor is it clear that there is really a substitution at work (that is, that the judges who impose time limits actually have a lighter hand when it comes to excluding evidence through the traditional evidentiary rules). But for a judge who believes restrictions are necessary—and who sees the only question as whether to restrict on a retail or on a wholesale basis—there are efficiency, autonomy, and fairness arguments in favor of the latter.[211]

B. SOME COMMONLY CITED BENEFITS, SUSCEPTIBLE TO CRITIQUE

Although it is true that trial time limits confer some advantages on jurors, courts, litigants, and the public, it is also true that some advantages that many associate with compressed trials are doubtful or exaggerated. Below, I consider, and simultaneously cast doubt on, assertions that trial time limits will (1) save courts and litigants money and time, (2) improve trial clarity and boost juror comprehension, and (3) revive the vanishing trial.

---

those who were pleasantly surprised by the length of service, 95% expressed a willingness to serve again. *Id.*

208. For discussion of Rules 403 and 611(a)(2), see *supra* note 84.

209. Patrick E. Longan, *Civil Trial Reform and the Appearance of Fairness*, 79 MARQ. L. REV. 295, 326 (1995).

210. United States v. Reaves, 636 F. Supp. 1575, 1580 (E.D. Ky. 1986) (supporting trial time limitations because they empower "counsel rather than the court" to decide "what evidence is to be admitted and what is to be pruned"); NAT'L CTR. FOR STATE COURTS, *supra* note 36, at 91 (tallying time limits' advantages and disadvantages and listing as a key advantage the fact that "overall time limits avoid micromanagement by the judge and thus reserve discretion to the trial attorneys, who have much greater familiarity with the case"); Leval, *supra* note 46, at 8 (suggesting that trial time limits "reduce[] the incidence of the judge interfering in strategic decisions").

211. On the other hand, as discussed below, there are countervailing considerations that militate toward "retail" limits under Rule 403 or 611(a)(2). Namely, when evidence is excluded under Rule 403 or 611(a)(2), because a clearly established standard has been identified and applied, an appellate court is better able to exercise meaningful review. This both adds to the legitimacy of the exclusion and promotes predictability, transparency, and horizontal equity.

### 1.  Cost and Time Savings?

Trial time limits are often embraced as a cost- and time-saving measure.[212] Timed trials are thought to be shorter—and, as night follows day, shorter trials are thought to lead to the faster and also cheaper resolution of disputes, benefiting litigants, courts, and the public.[213]

Trial time limits as a time-saving measure makes intuitive sense. But, for a number of reasons, it is not clear that this commonsense assumption withstands scrutiny. First, the assumption that time limits save time neglects the fact that, before a time limit is imposed, a court must actually calculate how much time will be needed and those calculations can themselves be time-consuming.[214] Second, the assumption also ignores the reality that, from the lawyer's perspective, the decision of *what* to cut or condense takes time and, as clients well know, lawyer time tends to be expensive.[215] Third, drawing on the law and economics literature, time limits can function like anchors, creating well-known anchoring effects.[216] So, if you tell a lawyer she gets a maximum of ten depositions or only thirty pages in a brief, she is apt to use all she is allotted, even though without a limit she may have deposed fewer witnesses or been more succinct. Applying this principle to the trial time limit context, it seems possible that restrictions may unintentionally increase, rather than reduce, the time litigants actually take.[217]

---

212. *See, e.g.*, FED. JUDICIAL CTR., *supra* note 92, § 6.01, at 203 ("Trials with established time limits tend to be . . . more efficient.").

213. For expressions of this conventional view, see, for example, Tersigni v. Wyeth-Ayerst Pharm., Inc., No. 11-10466-RGS, 2014 WL 793983, at *1 (D. Mass. Feb. 28, 2014) ("Imposing firm limits on the length of a trial is one of the most important ways a court can ensure a just, speedy, and inexpensive determination . . . ." (quotation marks omitted)); *Reaves*, 636 F. Supp. at 1580 (declaring that time limits "give[] a much lower cost to the clients" (quotation marks omitted)); Michael L. Seigel, *Pragmatism Applied: Imagining a Solution to the Problem of Court Congestion*, 22 HOFSTRA L. REV. 567, 600 (1994) ("Shorter trials would lead to the faster resolution of disputes."); David Bissinger & Erica Harris, *Working on the Clock: The Advantages of Timed Trials*, TEX. LAW., Apr. 2, 2012 ("[W]orking on a clock makes trying a case . . . less expensive . . . .").

214. Relevant to these calculations, the Third Circuit has held that "a district court should impose time limits only . . . after making an informed analysis based on a review of the parties' proposed witness lists and proffered testimony, as well as their estimates of trial time." Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 610 (3d Cir. 1995). The *Manual for Complex Litigation* says much the same. FED. JUDICIAL CTR., *supra* note 88, § 11.644, at 127 ("Before imposing limits, the judge should be sufficiently familiar with the litigation to form a reasonable judgment about the time necessary for trial and the scope of the necessary evidence.").

215. *See* Stambelos & Craigie, *supra* note 29, at 49 ("Preparation could actually cost more for a compressed trial, as greater thought and care are given to what must be shown versus what can be cut from the presentation.").

216. For further discussion of anchoring, see Timothy D. Wilson et al., *A New Look at Anchoring Effects: Basic Anchoring and its Antecedents*, 125 J. EXPERIMENTAL PSYCHOL. 387 (1996); Amos Tversky & Daniel Kahneman, *Judgment Under Uncertainty: Heuristics and Biases*, 185 SCIENCE 1124, 1128 (1974). For the more specific question of how quantity limits can affect behavior (and induce actors to buy or consume more than they would have, absent the limit), see Brian Wansink et al., *An Anchoring and Adjustment Model of Purchase Quantity Decisions*, XXXV J. MKT. RES. 71 (1998).

217. *Accord* Newman Interview, *supra* note 35 (recounting that, in the first reported time-limited trial, "[p]laintiff's case ended right on the end of the final day. They took up all the time they were permitted."). Even the Federal Judicial Center (a supporter of trial time limits) seems to acknowledge this point, as it explains: "The adage that work expands to fill the time available applies fully to trials."

Fourth and finally, some time limits are hotly contested. As Part II illustrates, when controversial limits are imposed, their imposition can kick off rounds of trial court argument and then months or even years of appellate court litigation as to their justification and propriety. Thus, the trial court may save itself an hour here or a day there—but in so doing it might add to the aggregate workload within the court system. And, of course, the drive to economize, in some instances, results in an expensive retrial.[218]

A 1996 RAND study, which considered the related topic of intense pretrial management, gives credence to the above concerns. That study found that "[e]arly judicial case management" was, as one might predict, "associated with . . . significantly reduced time to disposition."[219] Surprisingly, though, intense pretrial management was also associated with "significantly increased lawyer work hours" and a substantially higher cost.[220] Saved time and reduced cost do not necessarily go hand-in-hand.

2. Promotes Clarity and Improves Juror Comprehension?

Next, it is commonly said that trial time limits are beneficial because they lead to clearer trials; they promote jury comprehension because they induce counsel to put on a "cleaner, crisper, better-tried case."[221] When it comes to clarity, however, trial time limits are, again, a double-edged sword.

On the one hand, it is true that a trial time limit can prompt counsel to cut to the chase, pare down and prioritize her evidence, and exclude redundant or cumulative testimony. It is also true that this editing and winnowing can lead to a more succinct, powerful, and comprehensible presentation—and this can help jurors maintain attention and focus and, ultimately, reach a better result.

On the other hand, research does not suggest that jury confusion is that big of a problem; jurors seem to understand even complicated evidence quite well.[222] Further, even *if* jury confusion is a problem, it is not clear that shorter trials are the cure; though there is some indication that longer trials (of over twenty days) are associated with somewhat greater jury confusion, the evidence on that point

---

FED. JUDICIAL CTR., *supra* note 92, § 6.01, at 203. If twelve hours of trial time are allotted, it seems very likely that twelve hours of trial time will be utilized.

218.  For instances when trial time limits led to a reversal, see *infra* note 273.

219.  JAMES S. KAKALIK ET AL., AN EVALUATION OF JUDICIAL CASE MANAGEMENT UNDER THE CIVIL JUSTICE REFORM ACT, at xxiii (1996).

220.  *Id.* at 54–56, 205.

221.  United States v. Reaves, 636 F. Supp. 1575, 1580 (E.D. Ky. 1986) (quoting Leval, *supra* note 46 at 8); *see also* Tersigni v. Wyeth-Ayerst Pharm., Inc., No. 11-10466-RGS, 2014 WL 793983, at *1 (D. Mass. Feb. 28, 2014) (calling "firm limits on the length of a trial . . . a device for improving jury comprehension" (quotation marks omitted)); SCM Corp. v. Xerox Corp., 77 F.R.D. 10, 15 (D. Conn. 1977) (suggesting that time limits are needed "to promote juror comprehension").

222.  Developments in the Law, *The Civil Jury*, 110 HARV. L. REV. 1408, 1511 (1997) (amassing evidence "cast[ing] doubt on the contention that jury decisions in complex cases differ substantially from the decisions that judges, commonly perceived as the primary alternative to jurors, would make in these cases").

is mixed.[223]

Beyond that, even if it is true that shortening trials generally promotes jury comprehension, it is just as true that, if *rigid* limits are imposed, they can have the opposite effect. Most obviously—and as seen in *McKnight v. General Motors*—restrictive time limits can cause lawyers to rush their presentation of facts and hurry through arguments.[224] On this point, trial lawyer Richard Friedman's experience with a recent bad faith insurance trial in federal court, where each side was limited to nine hours, is instructive. When a nine-hour-per-side limit was initially imposed, he didn't worry: "I [initially] thought of it as an interesting advocacy challenge," he recalled.[225] In time, his view soured:

> In a bad faith case, the jury needs to be educated on the insurance business (context) before they can understand what to think about what the defendant did. The same is true of many cases where specialized knowledge is in play. We rushed through the educational portion of the trial, and as a result, most of the jurors were lost . . . .

In that case, after hearing eighteen hours of evidence, the jury deliberated for sixteen hours before it declared itself hung. Interviews with jurors afterward, Friedman recalls, confirmed that the jury was "dazed and confused" by the rushed presentation.[226]

Time limits can cloud the presentation of evidence in other ways, too. For one, as the custody case, *AC v. AC*, and the loss of consortium case, *Plaia v. Stewart Industries,* illustrate, trial time limits can also cause litigants to exclude or curtail crucial testimony.[227] Forcing litigants to leave probative evidence on the cutting-room floor, trial time limits can impair courts' search for truth and dramatically undermine judicial reliability. In addition, as seen in *Bertoli* (and discussed in more detail below), one side's tactical exploitation of time limits can cause it to *prolong* certain testimony or lodge unnecessary objections, which seems destined to confuse, rather than clarify.[228]

Digging deeper, the assumption that "time limits promote clarity" rests on a shaky intellectual foundation. The idea rests on the premise that limits are needed

223. *Compare* Richard Lempert, *Civil Juries and Complex Cases: Taking Stock After Twelve Years* 20 (Ctr. for Research on Soc. Org., Working Paper Series No. 488, 1992) (maintaining that "length alone does not seem to lead to jury confusion"), *and* Richard Lempert, *Civil Juries and Complex Cases: Taking Stock after Twelve Years*, *in* VERDICT: ASSESSING THE CIVIL JURY SYSTEM 182 (Robert E. Litan ed., 1993) [hereinafter "Lempert, *in* VERDICT"] ("[T]he jury often appears to do surprisingly well in the face of complexity, particularly insofar as complexity is defined by the length of trial . . . ."), *with* CECIL ET AL., *supra* note 205, at 27–31 (reporting that "long-trial" jurors (in trials of over twenty days) reported having a bit more difficulty understanding evidence and somewhat more trouble paying attention, as compared to short-trial jurors).

224. *See* Rumel, *supra* note 22, at 254 ("Unreasonable time limits may promote confusion and speculation rather than clarity, and, ultimately, may lead to unreliable judgments.").

225. E-mail from Richard Friedman (May 7, 2015) (on file with the author).

226. *Id.*

227. *See supra* notes 76–78, 132–49 and accompanying text.

228. *See supra* notes 120–31 and accompanying text.

because, left to their own devices, trial lawyers won't be clear. The underlying assumption is that, as one judge put it, trial attorneys can't "tell you what time it is without describing how the clock was made"—and judicial interference is therefore needed to help lawyers stay on script.[229] But this argument is not only empirically doubtful (do trial judges really know how to try cases any better than trial lawyers, who try cases for a living?), it is also highly paternalistic—and, critically, there is scant reason to believe that, in this instance, paternalism is justified.

To be sure, if we believed lawyers' judgment (of how many witnesses to call, how many questions to ask, how many exhibits to proffer) was blurred by their own self-interest, it might make sense to cede power to the judge to make those strategic decisions. Tellingly, this appears to be precisely the assumption that undergirds certain commentators' support for this mechanism.[230] Thus, some have suggested that, if lawyers are left to their own devices, trials will last too long because of "economic incentives."[231] Says one: "Lawyers who bill by the hour are happy to be in court because the clock is running. Some even charge a premium for court time; for them, prolonging a trial is especially rewarding."[232] As conceptualized by these scholars, then, there is a classic principal-agent problem that time limits can solve.[233]

But this argument falters when applied to the realities of trial practice. In particular, the contention that time limits are needed to counter principal-agent problems (that is, that lawyers will be tempted to drag their heels contra to the client's interest) ignores the fact that one side's lawyer (the plaintiff's) is likely being paid a contingency fee.[234] Paid only if, and to the extent, he prevails for his client, a contingency fee lawyer already has a built-in incentive to be efficient. Contingency fee lawyers, in fact, have an incentive not to drag their heels, but

---

229. United States v. Reaves, 636 F. Supp. 1575, 1579 (E.D. Ky. 1986).

230. *See, e.g.*, Longan, *supra* note 22, at 700 (arguing that "[t]rial lawyers have incentives and tendencies apart from those of their clients that cause trials to last too long").

231. Seigel, *supra* note 213, at 598.

232. *Id.*; *accord* Longan, *supra* note 22, at 700 ("[T]he mercenary lawyer may view a higher fee as a benefit rather than a cost of additional trial time."). For his part, Seigel goes on to acknowledge that contingency fee lawyers aren't paid by the hour but nevertheless insists that "after investing in a case, they are motivated to win, not rush." Seigel, *supra* note 213, at 598. This is true, but it misses the point. The question is not whether, if left to her own devices, a lawyer will "rush." The question is whether she will prolong the case, beyond what is optimal from her client's perspective. There is scant reason to believe that a contingency fee lawyer (or, for that matter, a government lawyer) will do so.

233. In particular, scholars are implicitly arguing: (1) the agent (the lawyer) is tempted to supply too much of his services (his time); (2) the principal (the client) will lack the information and expertise necessary to assess the agent's performance and impose proper discipline; and (3) the judge (the neutral expert) is needed to step into the client's shoes and do what the client can't. *See* Elliott, *supra* note 167, at 330 (offering a similar analysis). To be sure, it is possible that some lawyers stall in *service* to the client, by, for example, burying a weakness in an avalanche of other material—and this stalling may cause externalities. When judges see this gamesmanship, however, they have other targeted mechanisms to move things along. *See, e.g.*, FED. R. EVID. 403, 611.

234. DALE ANNE SIPES ET AL., NAT'L CTR. FOR STATE COURTS, ON TRIAL: THE LENGTH OF CIVIL AND CRIMINAL TRIALS 58 (1988) (reporting on an ambitious study of trial behavior involving 1,500 trials in three states and noting "[i]n all three states, most plaintiffs' lawyers work on a contingent fee basis and most defense lawyers work for an hourly rate").

rather to speed through the trial and give the best performance in the shortest pos-sible time.[235] Meanwhile, the defense lawyer, typically paid by the hour, may indeed have an incentive to drag his heels.[236] But the defense lawyer will, in many cases, be adequately monitored and controlled by sophisticated corporate counsel, making the judge's meddling superfluous.[237]

Finally, if the goal is to promote jury understanding, trial time limits are a blunt instrument. There are other more narrowly tailored reform ideas—including permitting jurors to take notes, offering pretrial jury instructions, supplying jurors with a post-delivery copy of the charge, rewriting jury instruc-tions to put them in simpler language, permitting "interim commentary," and letting jurors ask questions—that seem more likely to achieve the desired result in a more targeted way with fewer drawbacks.[238]

### 3. Resuscitates the Vanishing Trial?

Third and finally, as noted above, some praise time limits because they believe that these limits will help to resuscitate the vanishing trial. The argument is best expressed as a syllogism: (1) if time limits are imposed, trials will be shorter and cheaper (as assumed above), (2) if trials are shorter and cheaper, they will be less frightening/burdensome/costly, and (3) if trials are less frightening/burdensome/costly, more litigants will head to trial, as opposed to opting for private arbitra-tion, mediation, or acquiescing to an imperfect or insubstantial settlement.[239]

Once again, this argument is far from self-evident. For starters, the syllogism crumbles if the supposed time and cost-savings are nonexistent. In addition, severe trial time limits, if announced in the pretrial period (as they are supposed to be),[240] might induce a party to accept a settlement offer she would otherwise reject, particularly if the party is doubtful she can prove her case in the time

---

235. *See* Nora Freeman Engstrom, *Run-of-the-Mill Justice*, 22 GEO. J. LEGAL ETHICS 1485, 1525 (2009) (explaining that it is in the contingency fee lawyer's "short-term economic interest . . . to secure the maximum fee with the minimum expenditure of time and effort").

236. Deborah Rhode captures this temptation, explaining that "most lawyers will prefer to leave no stone unturned, provided, of course, they can charge by the stone." Deborah L. Rhode, *Ethical Perspectives on Legal Practice*, 37 STAN. L. REV. 589, 635 (1985).

237. *See* Moore, *supra* note 154, at 1236 (finding that, for five of the six largest categories of federal civil cases, individual plaintiffs litigate against corporate or governmental defendants).

238. Lempert, *in* VERDICT, *supra* note 223, at 219–224 (discussing the promise of these and other reforms); NAT'L CTR. FOR STATE COURTS, *supra* note 36, at 124–29, 132–37 (same); B. Michael Dann & Valerie P. Hans, *Recent Evaluative Research on Jury Trial Innovations*, 41 CT. REV. 1, 12 (2004) (same).

239. *See supra* note 201–02 and accompanying text. Without explicitly advocating trial time limits, others have argued that the excessive length of trials leads to "fewer trials and increased plea bargaining." Gordon Van Kessel, *Adversary Excesses in the American Criminal Trial*, 67 NOTRE DAME L. REV. 403, 477 (1992).

240. *See* FED. R. CIV. P. 16(c)(2)(O) (noting that, at a pretrial conference, the court may discuss whether it will "establish[] a reasonable limit on the time allowed to present evidence"); FED. JUDICIAL CTR., *supra* note 92, § 11.644, at 127 ("Generally, limits are best imposed before trial begins so that the parties can plan accordingly . . . .").

allotted.[241]

Having identified and evaluated certain advantages often associated with timed trials, section IV.C now turns to its drawbacks. In particular, I argue that (1) time limits are difficult to administer and are subject to strategic manipulation, (2) depending on time allocations, time limits risk slanting the civil justice system toward defendants, (3) time limits will impair litigants' sense of procedural justice, (4) time limits are subject to unprincipled, inconsistent, and arbitrary application, and (5) time limits represent a potentially misguided transfer of power from the advocate to the adjudicator and from jury to judge.

### 1. Difficult to Administer

First, the mechanics of trial time limits are invariably dicey. The problem is that once trial time limits are imposed, time must be allotted and it must also be kept. And although there are many ways to do this, each available mechanism is susceptible to criticism and prone to abuse.

In administering trial time limits, some courts charge *all* time (including time spent on cross-examination) against the party that called the testifying witness.[242] Others, meanwhile, count all time (including time making and responding to objections) against the party who is asking questions of the testifying witness (whether on direct or cross-examination).[243] Seeking greater accuracy, other courts employ the "stopwatch" approach. Pursuant to this approach, stopwatch in hand, the judge (or the judge's clerk) will time each party whenever that party is at the podium (whether on direct or on cross) and *also* whenever the party objects to evidence or testimony.[244] Others, finally, employ the stopwatch method but tweak it in service of still greater accuracy by "charging" time based on whether the party's objection was sustained or overruled. A court employing this method recently explained: "The amount of time taken to argue objections which are overruled by the court will be deducted from the objecting party's allotted time. The time for objections which are sustained by the court will be counted against

---

241. *See* Thornburg, *supra* note 21, at 1265 (suggesting that the "'management' of trials" can actually "exacerbate[] the 'vanishing trial' phenomenon"). On this point, one lawyer who responded to the Inner Circle survey, discussed *supra* at note 80, explained that he once settled a case after the trial judge imposed a rigid time limit because he felt that the client's case could not be successfully tried in the time allotted.

242. *See, e.g.*, Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 610 (3d Cir. 1995) ("Westinghouse's cross-examination of Duquesne's witnesses counted against Duquesne's time, and vice versa."); United States v. Reaves, 636 F. Supp. 1575, 1581 (E.D. Ky. 1986) ("Cross examination of a witness called by a party is part of that party's case for computation of time.").

243. *See, e.g.*, McKnight v. Gen. Motors Corp., 908 F.2d 104, 114–15 (7th Cir. 1990).

244. *See, e.g.*, Catipovic v. Peoples Cmty. Health Clinic, Inc., 401 F.3d 952, 958 (8th Cir. 2005) (Gibson, J., concurring) (noting that the lower court had advised counsel: "[W]hen you're on your feet, the clock is running.").

the proponent of the evidence that is the subject of the objection."[245]

Each of these methods, however, is highly imperfect.[246] For one, each inevitably pits accuracy against administrability: The more accurate a mechanism is, the more cumbersome it is to administer, and vice versa. Thus, the first two methods described above are straightforward but crude, whereas the last stopwatch mechanism is accurate but *extremely* cumbersome, particularly when rulings on evidentiary objections "split the baby," leaving the parties to quarrel as to which side "won" and "lost."

Each mechanism also invites a tactical response. For example, when a court charges all time (including time on cross-examination) against the party that initially called the testifying witness, the court creates a powerful incentive to prolong cross-examination.[247] Similarly, as *Bertoli* illustrates, if time making objections is not "charged" to the objecting party, a party will be encouraged to make frequent and lengthy objections.[248] Beyond that, and more generally, if the time restriction seems to be a bigger problem for one side than the other, the side not feeling the squeeze will be tempted to work that to its advantage, refusing, for example, to stipulate to the authentication of documents or facts that are not seriously in dispute.

Astute witnesses can also join in. On this point, trial lawyer Mark Lanier explained that he recently tried a time-limited product liability case where he felt that witnesses had been advised to draw out testimony, breeding an "epidemic of nonresponsiveness."[249] Lanier explained:

> So, every time I would ask every witness of the defense a question on the stand, they would always say: "Well—let me saaaaaayyyy," even if it was a yes or no question. They would almost rephrase the question and then give the answer. In other words, they were taking a considerable amount of time and burning it. So a question that could be as simple as "Sir, was the sun shining

---

245. Enright v. Auto-Owners Ins. Co., 2 F. Supp. 2d 1072, 1077 (N.D. Ind. 1998); *see also, e.g.*, *Reaves*, 636 F. Supp. at 1581 ("The time taken to argue all objections made by a party, which are overruled by the court, shall be deducted from the objecting party's time. Time for objections which are sustained will not be excluded from the time of the proponent of the evidence.").

246. In addition, each also forces the judge (or a clerk) to serve as timekeeper—often, with an actual stopwatch in hand—which, among other problems, invites disputes when the judge errs as she calculates how much time has been used and how much remains. *See, e.g.*, Trepel v. Roadway Express, Inc., 40 F. App'x 104, 108 (6th Cir. 2002) (evaluating the appellant's claim that the trial court committed reversible error when it "erroneously informed him that he had used 555 minutes of time, when, in fact, he had only used 511 minutes").

247. This seemingly happened in *Plaia*, where, recall, time ran out, and Peter Plaia was not permitted to testify. *See supra* notes 76–78 and accompanying text.

248. For *Bertoli*, see *supra* notes 126–30 and accompanying text. Other commentators have also commented upon this risk. *See, e.g.,* Longan, *supra* note 22, at 715 ("A lawyer who is willing to urge numerous objections . . . may be able to lower his adversary's amount of time artificially."). In one case, a party even complained on the record that opposing counsel "has taken up a lot of my time and I feel that to a very large extent his objections are calculated so as to use up my time." U.S. *ex rel*. J. Huizar & Sons, Inc. v. Envtl. Constr. Co., Nos. 93-16914, 94-15434, 1995 WL 218494, at *3 (9th Cir. Apr. 13, 1995).

249. Telephone Interview with Mark Lanier (Mar. 28, 2017) (on file with author).

> when you came to court today? Yes or no?," the answer would be "Well, when I came to court today, the sun, which we always know is above the clouds even if there are clouds was definitely reflecting its rays in a way where clouds had not hindered our ability to see the sun so I guess my answer would be yes." . . . They were trying to run the clock![250]

Trial lawyer Richard Friedman had a similar experience. Of his recent time-limited bad faith insurance trial, he reports:

> [T]he worst day was the last. We were low on time, with 73 minutes with which to cross-examine the remaining 7 witnesses. Defense was also running out of time, but they were able to put on their witnesses, have them quickly say 3–4 harmful things and then sit back and watch us struggle with cross. The witnesses were coached to say "Could you repeat the question," "Can I see that other document again? No, not that one, the one you showed me 5 minutes ago." "Can I have a drink of water?" It was a circus-like atmosphere, as we rushed to unsnarl disingenuous statements or outright lies.[251]

2. Susceptible to Inequitable Application

Trial time limits also force courts to determine how much time to allot and, crucially, how to divide the time between the plaintiff and defendant. Deciding the latter question, courts often allot equal—or nearly equal—amounts of time to those on either side of the "v."[252] Equal, courts seem to assume, is equitable. Or, as one court put it after calculating the amount of time a plaintiff would be given: "Fairness dictates that defendants be given equal time."[253]

But this is dubious. In fact, cutting trial time down the middle is often patently *unfair* because the plaintiff has the burden of proof and almost necessarily must amass more evidence than the defendant to prevail.[254] The idea is: It is harder to

---

250. *Id.*

251. E-mail from Richard Friedman (May 7, 2015) (on file with author).

252. *See, e.g.*, Deus v. Allstate Ins. Co., 15 F.3d 506, 520 (5th Cir. 1994) (giving each side three days); Tersigni v. Wyeth-Ayerst Pharm., Inc., No. 11-10466-RGS, 2014 WL 793983, at *2 (D. Mass. Feb. 28, 2014) (allotting eighteen hours per side); *In re* City of Bridgeport, 128 B.R. 589, 592 (Bankr. D. Conn. 1991) (allotting twenty-six hours per side); *see also* Maloney v. Brassfield, 251 P.3d 1097, 1103 (Colo. App. 2010) (affirming the trial court's decision to split time equally, while rejecting "[plaintiff's] assertion that the party who bears the burden of proof should receive a greater allocation of time"). Interestingly, in my survey of Inner Circle members, described *supra* at note 80, seventeen out of the twenty-one respondents agreed that, in their experience, "judges tend to restrict plaintiffs and defendants to the same amount of time."

253. Latino Officers Ass'n v. City of New York, No. 99 Civ. 9568, 2003 WL 22300158, at *5 (S.D.N.Y. Oct. 8, 2003).

254. A version of this debate played out in 2014, when the Rules Committee for the U.S. Judicial Conference considered (and ultimately rejected) certain changes to federal civil discovery. In particular, the Committee considered slashing the number of depositions from ten to five and reducing their presumptive maximum length from seven to six hours (while also imposing caps on interrogatories and requests for admissions). *See* Duke Conference Subcomm., *Report of the Duke Conference Subcommittee*, *in* ADVISORY COMMITTEE ON CIVIL RULES 79, 89 (2014). Soon after the proposal went public, however, a controversy erupted, as plaintiffs' attorneys "blasted the committee," arguing that the

build a house than to tear down a house—and if the builder and the wrecking crew are given equal time, the builder is bound to be disadvantaged. Or again, to quote Lanier:

> I've got to put on [the] plaintiff, I've got to show injuries, I've got to show causation, I've got to show all these different elements. All the defense has to do is disprove one of them. If they disprove causation, they don't have to disprove damages, they don't have to disprove liability, they can focus everything on one issue. I have no choice. I have to prove them all. And I don't know which one they may choose to focus on with their time until I've rested. Then I've got to save enough time to try and neuter whatever it is they're doing.[255]

But do plaintiffs really need more time than defendants? The answer, supplied by the NCSC, is a resounding yes. In particular, in 1985 (before time limits really took off), the NCSC conducted an ambitious study of trial time to see how it was used with an eye toward making trials more efficient. As part of this study, the NCSC amassed information from 1,500 civil and criminal trials from three states.[256] The NCSC found that, across case categories, the plaintiff's presentation of evidence took far longer than the defendant's presentation. In fact, as shown in Table 1, the plaintiff's presentation often took twice as long, and sometimes it took more than three times as long.

For our purposes, the NCSC's study makes two critically important points. First, the data suggest that when it comes to trial time defendants typically need just a fraction of the time that plaintiffs need—and they have historically used just a fraction of the time plaintiffs have used. Left to their own devices, defendants defend tort, contract, and property cases using far less time than plaintiffs use to prosecute those same cases. Equally important, the NCSC's data suggest that, although an "equally imposed" trial time limit (such as a four-hour limit in a

---

proposed changes were unfair, would compromise plaintiffs' ability to marshal evidence, and would "make it easier for corporate executives and other deponents to evade questioning." Greg Ryan, *Proposed Discovery Limits Set to Rock Federal Litigants*, LAW360 (Aug. 30, 2013 8:18 PM), https:// www.law360.com/articles/468586/proposed-discovery-limits-set-to-rock-federal-litigants [https://perma. cc/8S8B-XMMP]. It bears emphasis: The proposed limits, embraced by the defense bar and excoriated by the plaintiffs' bar, would have "equally" affected both parties. But it was widely understood that, given plaintiffs' greater evidentiary burden, the amendment's *effect* actually wouldn't be equal; it would be to "benefit large corporate litigants and disadvantage individual plaintiffs, classes of plaintiffs and groups suing to enforce their civil rights." Henry J. Kelston, *FRCP Discovery Amendments Prove Highly Controversial*, LAW360 (Feb. 27, 2014 5:06 PM), https://www.law360.com/articles/512821/frcp-discovery-amendments-prove-highly-controversial [https://perma.cc/LA2Q-MYXF].

255. Lanier Interview, *supra* note 249; *see also* Thornburg, *supra* note 21, at 1305–06 (observing that trial time limits are "more likely to have an adverse effect on the party with the burden of proof"). Trial time limits might also affect trials, not merely by affecting *whether* the plaintiff prevails—but, rather, by affecting how *much* the plaintiff is awarded, *if* she prevails. Here, in the response to the Inner Circle survey described *supra* at note 80, a seasoned plaintiffs' lawyer explained: "Juries will award more damages when we can show the full story and all of the Ds' misconduct. The more bad evidence, the bigger the award. Limiting trial time = limiting evidence = limiting the extent of how mad jury gets at D = lower damages."

256. *See* SIPES ET AL., *supra* note 234, at iii (discussing the study's methodology).

TABLE 1: MEDIAN TIME (IN HOURS AND MINUTES) CONSUMED BY PLAINTIFFS AND
DEFENDANTS IN CIVIL JURY TRIALS, BY CASE TYPE (TRIALS CONDUCTED IN 1985)[257]

| | Motor Vehicle Tort | Other Tort[¥] | Contract | Other Civil[‡] | Professional Malpractice | Product Liability |
|---|---|---|---|---|---|---|
| Total Trial Length[Δ] | 10:54 | 12:16 | 14:02 | 15:20 | 17:20 | 26:23 |
| Plaintiff's Time[◇] | 5:36 | 5:45 | 7:02 | 8:18 | 8:20 | 16:04 |
| Defense's Time[+] | 2:13 | 2:10 | 3:52 | 3:42 | 5:26 | 5:38 |

[Δ]Includes time consumed by the plaintiff and defendant as well as additional trial segments, such as jury selection and the provision of jury instructions.
[◇] Includes opening statement, presentation of evidence, rebuttal, and closing argument.
[+]Includes opening statement, case-in-chief, and closing argument.
[¥] Includes personal injury, property damage, and wrongful death cases, caused neither by defective products nor by automobiles.
[‡] Includes real property rights, civil fraud, and other miscellaneous cases.

contract dispute, a six-hour limit in a product liability trial, or a three-hour limit in a car wreck case) may look good and fair, it isn't. It will, in fact, leave the defendant wholly untouched, while cutting the plaintiff to the bone.

In sum, when imposing trial time limits, many courts split time down the middle. But "equal" limits, on average and over time, are apt to disproportionately hurt plaintiffs. That, in turn, means that this uncontroversial mechanism, designed to promote efficiency and improve clarity, might, in fact, be systematically biasing the civil justice system, perhaps dramatically.[258]

3. Impairs Procedural Justice

The third concern is that trial time limits can erode the dignity of trial and impair litigants' sense of procedural justice. This concern was first voiced back in 1992, as limits started to take hold. At the time, a commentator noted: "As the trial moves from a decorous and deliberative process toward a 'Beat the Clock' game show atmosphere . . . the litigant will believe that efficiency has triumphed over substance."[259] Recent years have proved the commentator prescient. As seen above, in *McKnight* and the running witnesses, or in *AC v. AC* when the mother's talk of physical abuse was interrupted and curtailed, numerous courts have permitted

257. *Id.* at 10 tbl.2.
258. This is a particular concern because bargaining, it is widely understood, takes place in the shadow of trial; settlements reflect (though discount) the costs of discovery and the likely verdict. *See* Robert H. Mnookin & Lewis Kornhauser, *Bargaining in the Shadow of the Law: The Case of Divorce*, 88 YALE L.J. 950, 997 (1979). Furthermore, as fewer and fewer cases go to trial, each remaining trial casts a larger and darker shadow. This means that, if the plaintiff's or defendant's hands are tied in one trial, and that fact distorts the jury's verdict, the effect will not just be felt in the instant case but in a rippling series of cases to come.
259. Rumel, *supra* note 22, at 253.

their preoccupation with the clock to undermine the dignity of trials and chip away at other process values typically thought to attend formal adjudication. Inflexibly enforcing preset time limits, judges have limited testimony, silenced argument, and excluded exhibits.[260] And even when the worst is averted, it appears that too many judges have come to resemble stressed out NBA timekeepers, regularly updating litigants on how much time has elapsed and how many minutes remain.[261]

This, too, is problematic because a large and developed literature suggests that "people are remarkably sensitive to the process and procedures they experience in encounters with the law."[262] Of course, litigants care about winning and losing. But litigants also care mightily—and sometimes even more deeply—about whether they believe the process by which they won or lost was fair.[263] Or, as Tom Tyler has put it: "[T]hose affected by the decisions of third parties in both formal and informal settings react to the procedural justice of the decision-making process at least as much, and often more, than they react to the decision itself."[264] If litigants view the process as fair, they will view the proceeding as legitimate and they will be more likely to accept an unfavorable decision. If they don't, individuals' respect for law, their confidence in the justice system, and their compliance with adverse decisions may suffer.[265]

Further, this voluminous literature hints at what a "fair" process entails. In deciding whether a process is "fair," individuals look to whether there are sufficient and sufficiently meaningful "opportunities for participation";[266] whether

---

260. *See supra* notes 97–149 and accompanying text; *see also* Flaminio v. Honda Motor Co., 733 F.2d 463, 473 (7th Cir. 1984) (lamenting the trial court's "unhealthy preoccupation with the clock"); Kinney v. Bourgeois, Nos. 2006 CA 2384, 2006 CA 2385, 2007 WL 2686113, at *8 (La. Ct. App. Sept. 14, 2007) (noting the trial's "pervasive theme" was the need to "hurry[] these matters along"); Gohl v. Gohl, 700 N. W.2d 625, 638 (Neb. Ct. App. 2005) (discussing the parties' "hurried evidentiary presentation").

261. Indeed, some appellate courts have suggested that these regular updates are consistent with best practice. Maloney v. Brassfield, 251 P.3d 1097, 1104 (Colo. App. 2010) (advising lower courts that "a trial court should keep [the parties] informed of their status on the clock").

262. E. Allan Lind et al., *In the Eye of the Beholder: Tort Litigants' Evaluations of Their Experiences in the Civil Justice System*, 24 LAW & SOC'Y REV. 953, 957 (1990).

263. Tom R. Tyler & E. Allan Lind, *Procedural Justice*, *in* HANDBOOK OF JUSTICE RESEARCH IN LAW 65, 68 (Joseph Sanders & V. Lee Hamilton eds., 2001) ("While lawyers and judges often think that people's reactions to their experiences are driven by whether or not they 'win' their case, that position is not supported by empirical research on disputing.").

264. Tom R. Tyler, *What Is Procedural Justice?: Criteria Used by Citizens to Assess the Fairness of Legal Procedures*, 22 LAW & SOC'Y REV. 103, 128 (1988).

265. *See* Elizabeth Chamblee Burch, *Calibrating Participation: Reflections on Procedure Versus Procedural Justice*, 65 DEPAUL L. REV. 323, 330 (2016) ("[S]tudy after study shows that disputants are more willing to accept and voluntarily comply with decisions that are reached fairly."); Deborah R. Hensler, *Suppose It's Not True: Challenging Mediation Ideology*, 1 J. DISP. RESOL. 81, 88 (2002) (summarizing the research as stating that "[p]eople accorded legitimacy to—and were willing to comply with the outcomes of—dispute resolution procedures when the outcomes were unfavorable to them, as long as they viewed the processes used as fair"); Longan, *supra* note 209, at 297 ("The legitimacy of any system of resolving civil disputes ultimately depends on the willingness of parties to abide by the results, and that willingness will be undermined by procedures that are perceived as unfair.").

266. Tom R. Tyler, *Social Justice: Outcome and Procedure*, 35 INT'L J. PSYCHOL. 117, 121 (2000) (discussing "participation effects," in which subjective feelings of fairness are "enhanced when people feel that the things they say are shaping the outcomes of the dispute").

the procedure feels decorous, respectful, and meticulous, as opposed to slap-dash and undignified;[267] whether the adjudicator appears neutral, impartial, and evenhanded;[268] whether the process is "thorough," meaning whether sufficient attention is paid to the facts of the dispute;[269] and finally and relatedly, whether "the judge is seen as having taken enough time to consider the case carefully."[270]

This all means that, to the extent trial time limits degrade procedures, stifle individuals' ability to testify, erode litigant autonomy, and turn trials into hurried and hasty affairs, time limits may cause us to sacrifice the core benefits thought to accompany trials.[271]

### 4. Unprincipled, Unguided, Inconsistent, and Arbitrary

Fourth, trial time limits suffer from the lack of positive law that attend their imposition. Although detailed rules guide discovery, specific rules (and detailed commentary to those rules) guide motions practice, dozens of rules guide trial judges in the admission or exclusion of evidence, and specific limits govern even the length of appellate briefs and time of appellate argument, there are no rules—and barely any standards—to provide *ex ante* guidance for judges deciding whether to impose time limits at all or how to calculate how rigid or flexible those limits should be. Further, on the back end of litigation, time limits typically evade meaningful appellate review. Although a limit can, theoretically, be so strict and arbitrary that its imposition constitutes a violation of due process,[272] few time restrictions have ever been reversed.[273]

---

267. Lind et al., *supra* note 262, at 958, 981; Tyler, *supra* note 266, at 121–22.

268. Tyler, *supra* note 266, at 122.

269. Hensler, *supra* note 265, at 95 (highlighting the importance of "lack of bias" and "thoroughness, defined as the amount of attention given to the facts of the dispute"); *accord In re* Marriage of Ihle, 577 N.W.2d 64, 68 (Iowa Ct. App. 1998) (concluding that "public confidence in the justice system tends to become tarnished when a trial concludes without an opportunity for the parties to present all the evidence they believe to be important").

270. Tom R. Tyler, *The Role of Perceived Injustice in Defendants' Evaluations of Their Courtroom Experience*, 18 LAW & SOC'Y REV. 51, 67 (1984).

271. In so doing, time limits may cause judges to violate their ethical obligations, including to conduct "every proceeding before him or her . . . with unhurried and quiet dignity," STANDARDS FOR CRIMINAL JUSTICE: SPECIAL FUNCTIONS OF THE TRIAL JUDGE Standard 6-1.1(b) (AM. BAR ASS'N 2000), and to be "patient, dignified, and courteous to litigants, . . . witnesses, [and] lawyers," MODEL CODE OF JUDICIAL CONDUCT R. 2.8(B) (AM. BAR ASS'N 2007).

272. *See In re* Murchison, 349 U.S. 133, 136 (1955) (declaring that "[a] fair trial in a fair tribunal is a basic requirement of due process" and that, to be considered "fair," "justice must satisfy the appearance of justice" (quotation marks omitted)).

273. Few appellate courts have reversed a lower court's decision to impose a trial time limit. *See* Goldman & Sinclair, *supra* note 37, at 390 ("Even those cases which have been critical of the trial court's actions have not reversed them."); Rumel, *supra* note 22, at 238 (noting that time limits have been upheld in "virtually every case"). Rare exceptions include Sparshott v. Feld Entm't, Inc., 311 F.3d 425, 434 (D.C. Cir. 2002) (reversing, where one defendant was given less than half as much time as the plaintiffs or the other defendant); Newton Commonwealth Prop., N.V. v. G+H Montage GmbH, 404 S. E.2d 551, 552 (Ga. 1991) (reversing, where the "trial court's efforts to simplify this complex matter . . . had the effect of prejudicing the parties and preventing a full and meaningful presentation of the merits of the case"); AC v. AC, 339 P.3d 719, 720 (Haw. 2014) (reversing, for reasons described in Section II. D); Doe v. Doe, 44 P.3d 1085, 1086, 1096 (Haw. 2002) (reversing, where the trial court's imposition of

   This evasion occurs because a number of obstacles effectively insulate trial time limits from meaningful appellate scrutiny. First, for an appellate court to review a limit at all, the aggrieved party must have lodged a timely objection—and many appellate courts also require aggrieved parties to make timely offers of proof, detailing what exactly they would have admitted into evidence if they had had adequate time.[274] Flustered and hurried, many time-limited litigants neglect this initial step, which many reviewing courts find fatal.[275] Second, if review is actually obtained, that review proceeds under an abuse of discretion standard.[276] Under this extraordinarily deferential standard of review,[277] the trial court's limit "will not be overturned on appeal absent a manifest injustice to the parties"[278] or, as another court has put it, unless the trial court has committed a "clear error of judgment."[279] Third and finally, if and only if the appellant runs that gauntlet—and the appellate court concludes that (1) the appellant has preserved its objection, and (2) the trial court abused its discretion—will a reviewing court consider whether the error was prejudicial. Then, for this prejudice prong to be satisfied, the reviewing court must conclude that it is "highly probable that the error affected the party's rights" or "that the verdict more probably than not was tainted."[280] This erects yet another high bar for time-limited litigants to clear, particularly because they are complaining about the hypothetical effect of testimony

---

a three-hour time limit in a child custody case led to the exclusion of important evidence "bearing upon the issue of family violence"); Turner v. Belman, No. 15-1742, 2016 WL 1129367, at *1 (Iowa Ct. App. Mar. 23, 2016) (finding that the trial court abused its discretion in limiting the defendant to seven and a half minutes to "cross-examine witnesses, present evidence, and present argument"); Rasmussen v. Rasmussen, No. 03-1206, 2004 WL 1073706, at *3 (Iowa Ct. App. May 14, 2004) (reversing, where the trial court limited a contested domestic abuse hearing to one-half hour); Chandler v. FMC Corp., 619 N. E.2d 626, 629 (Mass. App. Ct. 1993) (reversing, where "arbitrary time limits on the witnesses' testimony . . . prevented the parties from presenting their entire case to the jury"); Ingram v. Ingram, 125 P.3d 694, 698 (Okla. Civ. App. 2005) (reversing, where the trial court "arbitrarily" limited time); Campbell v. Campbell, 642 S.E.2d 769, 773 (Va. Ct. App. 2007) (reversing, where the trial court prohibited a litigant from cross-examining two witnesses because he had depleted his allotted time).

   274. *See, e.g.*, Life Plus Int'l v. Brown, 317 F.3d 799, 807 (8th Cir. 2003) ("To preserve this issue for our review, a party must lodge a timely objection to the time limits and must make a proffer of evidence that was excluded for lack of sufficient time." (citing Johnson v. Ashby, 808 F.2d 676, 678–79 (8th Cir. 1987))), *as amended on reh'g in part* (Feb. 19, 2003); Colquitt v. Muhammad, 86 S.W.3d 144, 152 (Mo. Ct. App. 2002) ("A party who complains about the exclusion of evidence should make an offer of proof to inform the trial court of the content of the evidence proffered . . . .").

   275. *See, e.g.*, Pierce v. Cty. of Orange, 526 F.3d 1190, 1200 (9th Cir. 2008) (faulting plaintiffs because they "objected to the time limitation but did not specify what evidence they would have presented if more time had been allotted"); *Life Plus Int'l*, 317 F.3d at 807 ("We conclude that Life Plus sacrificed its challenge to the time limits by not presenting an offer of proof to the district court concerning what evidence and claims it was unable to present due to the time limits.").

   276. *See, e.g.*, *Sparshott*, 311 F.3d at 433 ("The district court's decisions on how to structure time limits are reviewable only for abuse of discretion."); Monotype Corp. v. Int'l Typeface Corp., 43 F.3d 443, 450 (9th Cir. 1994) ("The imposition of time limits, a factor that goes to the fairness of the trial, is reviewed for an abuse of discretion.").

   277. *See, e.g.*, *In re* S.D. Microsoft Antitrust Litig., 657 N.W.2d 668, 678 (S.D. 2003) ("Abuse of discretion is the most deferential standard of review available with the exception of no review at all.").

   278. Strickland Tower Maint., Inc. v. AT&T Commc'ns, Inc., 128 F.3d 1422, 1430 (10th Cir. 1997).

   279. Weinberger v. Great N. Nekoosa Corp., 925 F.2d 518, 529 (1st Cir. 1991).

   280. 12 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 61.02[3] (3d ed. 1997).

they could not offer, questions they could not ask, objections they could not raise, and points they could not argue—which necessarily means that they are arguing on shaky and speculative ground.[281]

The upshot is that, even though appellate courts frequently pay lip service to the notion that restrictions must be reasonable,[282] and even sometimes fret that "arbitrary, inflexible time limits can impose a serious threat to due process principles,"[283] they have only infrequently provided more concrete guidance. And, when it is time to put their money where their mouth is, appellate courts sometimes rubber stamp limits that are unreasonable, extreme, and arbitrary.[284]

This lack of meaningful appellate review has far-reaching consequences. Most obviously, this appellate inattention means that trial courts can drastically curtail trial time with little fear of official approbation. Beyond that, this rubber-stamping hinders appellate courts from creating a "common law of time limits." In many other areas—particularly where there is little formally enacted positive law—appellate courts step in to fill holes and connect dots. Over a series of cases, appellate courts flesh out relevant standards, clarify requirements, and thereby provide explicit and meaningful guidance to lower courts. This area is somewhat unique, however, because it is marked by both a lack of positive law (because there are no mandates from the legislature or standards from Rules Committees) and an absence of judicially created standards that trial court judges can consult (or litigants can point to) when considering which restrictions are permissible and which go too far.[285]

The fact that trial time limits suffer from a dearth of positive law *and* almost no back-end check itself has repercussions. Three stand out. First, as Robert Bone has observed (in the context of judicial discretion, generally), when trial judges

---

281. This is particularly true because, as one court has observed: "The importance of evidence is often not understood until all the evidence is heard." *In re* Marriage of Ihle, 577 N.W.2d 64, 68 (Iowa Ct. App. 1998). Or, as Elizabeth Thornburg has observed: "Often, because they are complaining about things they were *not* allowed to do, appellants are in a position of asking the court of appeals to speculate both about what greater opportunity would have allowed and about the impact of that information." Thornburg, *supra* note 21, at 1314 (emphasis in original).

282. *See, e.g.*, Life Plus Int'l v. Brown, 317 F.3d 799, 807 (8th Cir. 2003) ("We reemphasize our disapproval of rigid hourly time constraints at trial . . . ."), *as amended on reh'g in part* (Feb. 19, 2003); Flaminio v. Honda Motor Co., 733 F.2d 463, 473 (7th Cir. 1984) ("[W]e disapprove of the practice of placing rigid hour limits on a trial.").

283. *In re Marriage of Ihle*, 577 N.W.2d at 68.

284. *See, e.g.*, Crabtree v. Nat'l Steel Corp., 261 F.3d 715, 720–21 (7th Cir. 2001) (affirming, despite finding court's order that limited trial time for plaintiff and defendant to one hour each with an additional one hour to the plaintiff for rebuttal "problematic"); Lawellin v. Wilson, No. 1 CA-CV-16-0547 FC, 2017 WL 2953347, at *1, *3 (Ariz. Ct. App. July 11, 2017) (affirming trial court's order limiting the father in a custody dispute to one hour and fifteen minutes and refusing to grant additional time to cross-examine the child's mother); *In re Marriage of Ihle*, 577 N.W.2d at 64, 66 (affirming a four-day trial time limit despite requests for additional time and the court's refusal to hear from a party's additional witnesses); McCray v. McCray, No. 05-15-01557-CV, 2017 WL 3097626, at *2 (Tex. App. July 21, 2017) (affirming time limit of twenty minutes per side because pro se litigant waived the error by failing to object).

285. Thornburg, *supra* note 21, at 1298–99 (discussing the lack of "[s]ystematic guidance"). The text includes the qualifier "somewhat" because, as explained below, many decisions that fall under the managerial judging umbrella share these attributes. *See infra* notes 288–91 and accompanying text.

make decisions in a vacuum, they are more likely to be affected by cognitive errors and biases than they would be if they were guided by an "outsider perspective."[286] The absence of positive law may actually impair the *quality* of judicial judgment.

Second, the absence of positive law almost certainly affects decisional consistency. With no rulebook to look to, judges impose restrictions guided by little more than their instinct and feel. This leads, inevitably, to inconsistency, unpredictability, and a lack of horizontal equity. It is very doubtful, in the current climate, that two judges asked to preside over two trials would both impose time restrictions, and if they did, it is *extremely* doubtful that they would allot similar amounts of time, even to similarly situated litigants.[287]

Last but not least, the absence of both positive law and meaningful back-end review means trial judges' discretion is essentially unbounded—and unbounded discretion opens the door to irrational, arbitrary, and abusive action.[288] This is a point many have made in the context of managerial judging more generally. The point is, "at least when judges make *legal* decisions, the parties have an opportunity to marshal arguments based on an established body of principles, judges are required to state reasons to justify their decisions, and appellate review is available."[289] When these "safeguards" are absent, however, courts have the power to "influence the outcome of litigation in ways that are arbitrary."[290] Or, as a 1990 Federal Courts Study Committee put it (again, in the very similar management context):

> [U]nlike motions to dismiss or for summary judgment, pretrial management decisions are made without any procedural safeguards. There are no standards for making these "managerial" decisions, the judge is not required to provide a "reasoned justification," and there is no appellate review. Each judge is free to consult his or her own conception of the importance and merit of the case and the proper speed with which it should be disposed. This, in turn, promotes arbitrariness.[291]

---

286. Bone, *supra* note 17, at 1986–96.

287. *See* Thornburg, *supra* note 21, at 1298–1300 (discussing the lack of positive law accompanying trial management decisions generally and noting that "[t]he result is a hodgepodge of potentially inconsistent rulings that vary from judge to judge and case to case").

288. *See* Martha Minow, *Judge for the Situation: Judge Jack Weinstein, Creator of Temporary Administrative Agencies*, 97 COLUM. L. REV. 2010, 2028 (1997) (observing that "reliance on the person of the judge exposes litigants, and society, to risks of abuse of power").

289. Elliott, *supra* note 167, at 317 (emphasis in original).

290. *Id.*

291. FED. CTS. STUDY COMM., *supra* note 154, at 55. As noted in the text, many others have made this point when evaluating the rise of managerial judging. Prominent examples include Resnik, *supra* note 19, at 425–26 (observing that, when it comes to managerial judging, "no explicit norms or standards guide judges in their decisions about what to demand of litigants" and that this vacuum "substantially expands the opportunities for judges to use—or abuse—their power"); Peterson, *supra* note 21, at 76 ("Unconstrained by precedent, unreviewed by appellate judges, and unchecked by the involvement of juries, district judges are free to manage cases as they wish."); Jonathan T. Molot, *How Changes in the Legal Profession Reflect Changes in Civil Procedure*, 84 VA. L. REV. 955, 1004–05 (1998) (observing that managerial decisions are "typically insulated from appellate review" and that judges may "choose to exercise their supervisory discretion in widely disparate ways, even when handling the same exact case").

So, too here.

### 5.  Represents Potentially Ill-Advised Transfer of Power from Advocate to Adjudicator and from Jury to Judge

Fifth and finally, trial time limits represent a worrisome transfer of power from the advocate to the adjudicator and from the jury to the judge. Traditionally, the bedrock of our adversary system has been party domination: Advocates selected by and faithful to litigants trigger the case's initiation, control its investigation, and, once at trial, have broad discretion to determine the proceeding's pace, sequence, direction, and style. The judge, meanwhile, is to be both neutral and sidelined. As Roscoe Pound told the ABA in his now-famous 1906 address: "[I]n America we take it as a matter of course that a judge should be a mere umpire . . . and that the parties should fight out their own game in their own way without judicial interference."[292] Except in exceptional circumstances, judges are supposed to stand back and let lawyers be lawyers. Just as crucially, they are to stand back and not determine who wins but, rather, let juries decide.[293]

No more. Like so many actions that fall loosely under the "managerial judging" umbrella, trial time limits rewrite these traditional rules.[294] When they impose and enforce rigid restrictions on trial time, judges exert comparatively more control over the pace, content, and character of litigation. In so doing, judges expand their power. As judges' power grows, both litigants' and jurors' power ebbs, pulling us ever further from our traditional adversarial roots.

To be sure, this shifting and shuffling may not be all bad.[295] There are many judicial systems throughout the world where judges wield comparatively more

---

292. Roscoe Pound, *The Causes of Popular Dissatisfaction with the Administration of Justice*, 29 ANN. REP. AM. BAR ASS'N 395, 405 (1906); *see also* STEPHAN LANDSMAN, THE ADVERSARY SYSTEM: A DESCRIPTION AND DEFENSE 34 (1984) ("Adversary theory requires the judge to remain passive until the conclusion of the advocates' presentations. He is not free to conduct an independent inquiry or otherwise accelerate the pace of the proceedings."); Abram Chayes, *The Role of the Judge in Public Law Litigation*, 89 HARV. L. REV. 1281, 1286 (1976) ("[T]he traditional conception of adjudication carried with it a set of strong notions about the role of the trial judge. In general he was passive . . . . The judge was a neutral umpire."); Marvin E. Frankel, *The Adversary Judge*, 54 TEX. L. REV. 465, 468 (1976) ("[A] central core of agreed standards defines the trial judge as the neutral, impartial, calm, noncontentious umpire . . . .").

293. Marcus, *supra* note 17, at 1563 ("At trial, the judge's discretion was usually circumscribed by the American reliance on the jury trial, which required the judge to leave the decision to the jury (subject to the judge's rulings on admissibility of evidence and under the judge's instructions) unless evidence was so obvious as to support entry of judgment as a matter of law.").

294. Many have noted that the advent of managerial judging reallocates power between adjudicator and advocate and "brings the American system closer to the inquisitorial system of Continental Europe." Ellen E. Sward, *Values, Ideology, and the Evolution of the Adversary System*, 64 IND. L.J. 301, 342 (1989); *see also, e.g.*, Langbein, *supra* note 21, at 858 (characterizing managerial judging as a change that "diminish[es] the contrast between German and American civil procedure").

295. To these points, one might add that our commitment to the adversary system has always been a bit schizophrenic. *See generally* Amalia D. Kessler, *Our Inquisitorial Tradition: Equity, Procedure, Due Process, and the Search for an Alternative to the Adversarial*, 90 CORNELL L. REV. 1181, 1187–98 (2005). And (as noted above) trial time limits are hardly the first innovation in tension with the traditional model. *See* LANDSMAN, *supra* note 292, at 28–32.

power and litigants comparatively less—whereas juries, in many systems, are discarded altogether. These systems, many argue, function fine.[296] Indeed, although there is a finite amount of power that the judge, jury, and litigants share, it is very hard to say what the optimal allocation of that power is. Because we don't know what the optimal allocation is, when there is a power shift we are hard-pressed to say whether that shift makes things better or worse.

True enough. But that does not mean we are out of the woods.[297] The fact is, for better or worse, we are committed to an adversary system in the United States that privileges party autonomy over virtually all other values, and the system's legitimacy has been built up over time around that basic design choice. As a result, we should be wary when we depart too far from that baseline. Further, we should be particularly wary here because the departure has not been accompanied by, as John Langbein puts it, "[c]ontinental-style attention to safeguarding litigants against the dangers inherent in the greatly augmented judicial role."[298]

Thus, it would be one thing if the shift were fundamental and the adoption of trial time limits were one small part of a wholesale and deliberate move to an inquisitorial system. It would also be a different story if time limits were the product of careful thought and were accompanied by finely tuned safeguards to protect juries and litigants. But they aren't (or, at least to this point, they haven't been). Indeed, for reasons explained above, even the last-ditch backstop of meaningful appellate review is, in this instance, generally absent. Instead, when it comes to the creation and widespread utilization of trial time limits, we have made a series of haphazard and disjointed decisions, mostly out of the light of day, without the benefit of deliberation or analysis. (Indeed, until now, no one has so much as cataloged time limits' many drawbacks.) Further, the product of those decisions has been to significantly expand judicial power at the expense of juries and litigants when it comes to trials—the cornerstone of our adversary system. This, to quote Professor Arthur Miller, is not necessarily a bad idea, but it is "potentially a very high stakes poker game." [299] It ought to give us pause.

## V. A PATH FORWARD

Some trial time limits are in some instances a good thing. Only a curmudgeon or fanatic would blame Judge Jon Newman for his decision to impose restrictions in *SCM Corp. v. Xerox Corp.* to keep that gargantuan proceeding "within

---

296. Some conclude they function better than fine. *See generally, e.g.*, Langbein, *supra* note 21. The prime alternative is, of course, the inquisitorial system. For the key differences between the adversarial and inquisitorial models, see Kessler, *supra* note 295, at 1187–98.

297. To be sure, many are deeply committed to our adversary tradition, and there is a rich literature espousing its virtues. For these scholars, time limits might be condemned simply because they represent an incursion on, or are incompatible with, our adversary tradition. For a taste of that literature, see generally LANDSMAN, *supra* note 292.

298. Langbein, *supra* note 21, at 861.

299. MILLER, *supra* note 151, at 30. Miller said this when critiquing the amended Rule 16's "departure from the traditional adversary model." *Id.* at 29.

manageable proportions."[300] Further, as John Henry Wigmore declared nearly a century ago: "It has never been supposed that a party has an absolute right to force upon an unwilling tribunal an unending and superfluous mass of testimony limited only by his judgment or whim."[301] Yet, like so many other inventions of the modern era, trial time limits, if they are to be used, must not be used excessively or indiscriminately; rather, they must be used sparingly and in a targeted fashion. As Judge Richard Posner noted while affirming the judgment in *McKnight v. General Motors*: "[T]o impose arbitrary limitations, enforce them inflexibly, and by these means turn a federal trial into a relay race is to sacrifice too much of one good—accuracy of factual determination—to obtain another—minimization of the time and expense of litigation."[302]

Indeed, by more critically identifying time limits' pros and cons, we bring Judge Posner's observation into even sharper relief. Thus, as explained in section IV.B.1, it is not clear that trial time limits really do minimize the time and expense of litigation, as Judge Posner assumes. Efficiency gains may, in fact, be illusory. Likewise, on the con side of the ledger, trial time limits do much more than undermine the accuracy of factual determinations. As explained in section IV.C, time limits incentivize strategic gamesmanship; they can slant the playing field in favor of one party or another; when imposed inflexibly, they seem destined to impair litigants' sense of procedural justice; they are susceptible to unprincipled, arbitrary, inconsistent, and abusive application; and they represent a potentially unwise and illegitimate transfer of authority from the advocate to the adjudicator and from the juror to the judge.

Therefore, contrary to the view of some courts and commentators, trial time limits should not be used reflexively or indiscriminately. Rather, they should be used only on those rare occasions when their benefits exceed their costs. But that, of course, begs the question: How do judges tell the difference? I seek to answer this question below. To do so, I offer six recommendations that attempt to draw proper lines and provide appropriate safeguards. Recommendation 1 focuses on case selection; it helps courts identify particular cases where limits' benefits are most likely to exceed their costs. Recommendations 2, 3, and 4 focus on how to create, structure, and apply limits so they are fair and equitable and don't trammel on litigants' substantive and procedural interests.[303] Recommendation 5 looks after limits; it aims to promote effective judicial review and addresses many of the problems identified in section IV.C.4. Finally, Recommendation 6, which speaks not to judges or litigants but to the Administrative Office of the United States

---

300. 77 F.R.D. 10, 15 (D. Conn. 1977). Or, as the Third Circuit has put it: "[T]he courts need not allow parties excessive time so as to turn a trial into a circus." Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 610 (3d Cir. 1995).

301. 4 JOHN HENRY WIGMORE, A TREATISE ON THE ANGLO-AMERICAN SYSTEM OF EVIDENCE IN TRIALS AT COMMON LAW § 1907, at 75–76 (1923).

302. 908 F.2d 104, 115 (7th Cir. 1990).

303. Namely, Recommendations 2, 3, and 4 help courts respond to concerns addressed *supra* in Sections IV.C.1 (concerning sensible administration), IV.C.2 (regarding even-handed application), and IV.C.4 (to help to ensure that limits will not unduly undermine litigants' sense of procedural justice).

Courts, calls for more transparency with respect to limits so that future researchers will have a better factual template from which to draw. Ideally, courts, Rules Committees, and the Administrative Office will accept all six of these recommendations. However, I have crafted each to be freestanding so that courts and regulators can pick and choose.

**Recommendation 1**: Trial courts ought to restrict litigants' trial time only when the trial is apt to be protracted and there is a "risk that, without the imposition of controls, the trial might run on inordinately."[304] In the absence of a such a finding, the court may, of course, exclude evidence that is cumulative, that wastes time, or that causes undue delay via Rule 403 or 611(a)(2) (or their state-court counterparts). But trial time limits should not be utilized.

*Explanation Accompanying Recommendation 1*: When trial time limits made their debut, courts imposed controls only in complex and lengthy trials where there was a risk that the trial "could go on forever if controls were not put into place."[305] Similarly, early appellate court decisions implied that time limits were appropriate only in "protracted litigation."[306] Recommendation 1 thus returns trial time limits to their roots. In taking a firm stand that time limits should not be used regularly or reflexively, Recommendation 1 is also broadly consistent with ABA policy because ABA Standard 12(b) approves of time limits while cautioning that "trial courts . . . should not exercise this discretion as a matter of course."[307] Further, as a policy matter, Recommendation 1's delineation makes sense. Recalling the discussion in section IV.A., this targeted application reserves time limits particularly to rein in those trials that threaten to go on so long that the trial's excessive length risks distorting the jury pool and impairing juror comprehension.[308] Those jury composition and comprehension concerns are significant when a trial may stretch for sixty or seventy days. By contrast, when a judge is merely trying to trim a fifteen-day trial to twelve days—and particularly if he's trying to trim a fifteen-hour presentation to twelve hours—composition and comprehension concerns are already insignificant. Any gains that may come from further reductions are *de minimis*, tilting the cost-benefit calculus against time limits.

---

304. Leval, *supra* note 46, at 7.

305. Cursi, *supra* note 46, at 2 (quoting Judge Pregerson in an early time-limited trial).

306. MCI Commc'ns Corp. v. AT&T, 708 F.2d 1081, 1171 (7th Cir. 1983) ("This exercise of discretion may be appropriate in protracted litigation provided that witnesses are not excluded on the basis of mere numbers."); *accord* Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 609–10 (3d Cir. 1995) (holding that "because . . . such procedures can result in courts dispensing with the general practice to evaluate each piece of offered evidence individually, district courts should not exercise this discretion as a matter of course"); Sec'y of Labor v. DeSisto, 929 F.2d 789, 795 (1st Cir. 1991) (agreeing that time limits may be imposed in "protracted litigation").

307. CIVIL TRIAL PRACTICE STANDARDS § 12 (AM. BAR ASS'N 1998).

308. *Cf.* United States v. Warner, 506 F.3d 517, 524 (7th Cir. 2007) ("Exceedingly lengthy trials lead to reduced concentration and recollection of events on the part of all participants, particularly witnesses and jurors . . . . The quality and representative nature of the jury may be reduced by the fact that many citizens—often the most competent—are unable or unwilling to take the time to sit for cases lasting weeks or months.").

**Recommendation 2**: Trial courts should impose limits only after analyzing the parties' proposed witness lists and proffered testimony and evaluating the parties' own time estimates. If a court allocates to a party less than a certain percentage of the time the party estimated it needed to present its evidence (perhaps 80% or 90%), the court should offer a reasoned justification for that reduction on the record.

*Explanation Accompanying Recommendation 2*: Recommendation 2 is drawn from the Third Circuit's declaration that "a district court should impose time limits only when necessary, after making an informed analysis based on a review of the parties' proposed witness lists and proffered testimony, as well as their estimates of trial time."[309] Judges should, without question, be free to override counsels' estimates because counsels' estimates may be excessive or exaggerated. When they do, however, they should offer a reasoned explanation. The underlying principles are that courts should not pull restrictions from thin air, they should not impose restrictions without at least some adversarial ventilation, they should generally defer to counsel when imposing time limits (the individuals who, in most instances, know the case best), and when judges decide not to defer to counsel, they ought to create a clear record.

Recommendation 2 is aimed at mitigating several concerns raised above. First, to the extent limits roughly mirror parties' estimates, there is much less of a concern that limits will be so heavy-handed as to impair litigants' sense of procedural justice. Second, judges' reasoned justifications for why they are choosing to allot x days to case y—and 2x days to case z—will promote meaningful appellate review and may (over time) provide a resource to help guide and inform judicial discretion.[310] Third and finally, this Recommendation encourages judges to consult with—and often, defer to—counsel when setting limits—a nod to our adversary roots.

**Recommendation 3**: Trial courts must ensure that, when they impose trial time limits, they allocate time equitably. Toward that end, at least in civil litigation, there should be a rebuttable presumption that the party with the burden of proof is entitled to more time than a party free of that burden.

*Explanation Accompanying Recommendation 3*: Equitable allocation is essential to ensure that time limits do not become an underhanded way to advance the interests of one party over the interests of his or her adversary. In identifying which allocation is presumptively equitable, Recommendation 3 draws on the discussion in section IV.C.2, and particularly the trial time data amassed by the NCSC, to reject the idea espoused by some courts that "[f]airness dictates that

---

309. *Duquesne Light Co.*, 66 F.3d at 610. Recall too, in early cases, courts tended to give litigants *more* time than the litigants estimated they needed. *E.g.*, SCM Corp. v. Xerox Corp., 77 F.R.D. 10, 15 (D. Conn. 1977) (granting the plaintiff six months, "50% More than the top range of counsel's estimate").

310. *Cf.* Thornburg, *supra* note 21, at 1322 ("The problems of arbitrariness and lack of consistency might be alleviated by a requirement that trial courts provide reasons for their managerial orders and publish those decisions, in hopes that a coherent body of cases might result.").

defendants be given equal time."[311] In civil trials, plaintiffs have traditionally needed more time than defendants and have traditionally used more time than defendants. Against that backdrop, if time limits "equalize" plaintiffs' and defendants' time allocation, plaintiffs will often be disproportionately hurt. That said, Recommendation 3's presumption that the party with the burden of proof is entitled to more time than his adversary may be successfully rebutted in appropriate circumstances (such as when a case involves multiple defendants, who each must present a unique defense—or when the principal issue in a case is the applicability of an affirmative defense).[312]

**Recommendation 4**: When time limits are imposed, trial courts should be alert to strategic gamesmanship. When a court concludes that a party is manipulating the time restriction to advance its own strategic interest, the court should take appropriate remedial action.

*Explanation Accompanying Recommendation 4*: As section IV.C.1 explains, there is evidence that some savvy litigants have weaponized trial time limits. Such conduct (whether it takes the form of excessive objections, unnecessary sidebars, irresponsive witnesses, or strategically prolonged cross-examinations) wastes time, impairs juror comprehension, undermines public confidence, and is inimical to the efficient and orderly administration of justice. Courts should not tolerate such abusive conduct.

**Recommendation 5**: Appellate courts must alter the standard of appellate review. In so doing, appellate courts may continue to review limits pursuant to an abuse of discretion standard. However, on those rare occasions when a reviewing court concludes that a trial court abused its discretion in imposing a given limit and when the appellant lodged a timely objection to that limit back at the trial court, these findings alone should trigger reversal. Reviewing courts, in other words, should stop demanding that appellants show prejudice in addition to abuse.

*Explanation Accompanying Recommendation 5*: Recommendation 5 draws on section IV.C.4's conclusion that, in the majority of cases, trial time limits evade meaningful appellate review, and it seeks to change that—mindful that, by subjecting time limits to appellate scrutiny, we will in time minimize time limits' inconsistent, unpredictable, and arbitrary application. In so doing, Recommendation 5 accepts that time limits are properly reviewed pursuant to an

---

311. Latino Officers Ass'n v. City of New York, No. 99 Civ. 9568, 2003 WL 22300158, at *5 (S.D. N.Y. Oct. 8, 2003). In casting doubt on the "equal time" idea espoused by some courts, I am supported by the Federal Judicial Center, which instructs, in the *Manual for Complex Litigation*: "In designing limits, [courts should] consider the respective evidentiary burdens of the parties." Fed. Judicial Ctr., *supra* note 88, § 11.644, at 127.

312. Consistent with the above rule of thumb, courts trying criminal cases often do give the prosecution (the party with the burden of proof) additional time. *See, e.g.*, United States v. Reaves, 636 F. Supp. 1575, 1581 (E.D. Ky. 1986) (limiting the government to sixty-six hours of trial time and the defendants to thirty hours of trial time). But, I withhold judgment on the proper time allocation in criminal cases, as due process principles may counsel in favor of giving the prosecution and defendant another allocation.

abuse of discretion standard because this is the long-established standard for the review of trial management decisions.[313] However, it jettisons the need for the appellant to show prejudice. Doing so is admittedly controversial. It is rare for courts to declare that an error, once found, is reversible per se.[314] But it is not unprecedented. Particularly in the criminal law context, courts have declared that when a trial court makes a "structural error"—an error that "affect[s] the framework within which the trial proceeds"—prejudice is conclusively presumed and reversal is automatic.[315] It is but a small step to conclude that a trial court ruling that constitutes an abuse of discretion and effectively stops a trial in its tracks—and, in so doing, affects the parties' due process rights as well as the parties' rights under the Sixth or Seventh Amendment—"affect[s] the framework within which the trial proceeds" and thus belongs in this "structural error" category.[316]

**Recommendation 6**: The Administrative Office of the United States Courts should start collecting data on the imposition of trial time limits, identifying which trials are time-limited and, when applicable, recording the specific restriction imposed.

*Explanation Accompanying Recommendation 6*: To this point, trial time limits have flown under the academic radar. As either cause or consequence of this inattention, no central repository gathers, or has gathered, data on which trials are time-limited or how many time-limited trials are conducted each year. This lack of recordkeeping stymies researchers' ability to assess trial time limits' true incidence and effect. To promote transparency and address this gap in our knowledge, the Administrative Office of the United States Courts, which already

---

313. *See, e.g.*, Life Plus Int'l v. Brown, 317 F.3d 799, 807 (8th Cir. 2003) ("Trial management decisions are reviewed for an abuse of discretion."), *as amended on reh'g in part* (Feb. 19, 2003).

314. *See, e.g.*, 28 U.S.C. § 2111 (2012); FED. R. EVID. 103(a); FED. R. CIV. P. 61; 14 CYCLOPEDIA OF FEDERAL PROCEDURE § 68:51 (3d ed., 2017 update).

315. Rice v. Wood, 77 F.3d 1138, 1141 (9th Cir. 1996) (internal citations omitted). Structural errors are contrasted with trial errors—that is, those errors which "occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." Arizona v. Fulminante, 499 U.S. 279, 307–08 (1991).

316. As the text suggests, this jurisprudence is more fully developed in the criminal law context. Nevertheless, some courts have held that certain errors trigger automatic reversal, even in the civil context. *See, e.g.*, Kirk v. Raymark Indus., Inc., 61 F.3d 147, 160–61 (3d Cir. 1995); Perkins v. Komarnyckyj, 834 P.2d 1260, 1264 (Ariz. 1992); *In re* Det. of D.F.F., 256 P.3d 357, 361 (Wash. 2011). The most relevant such case is In re *Marriage of Carlsson*, 77 Cal. Rptr. 3d 305 (Ct. App. 2008). There, as in many cases above, the "trial court essentially ran the trial on a stopwatch, curtailing the parties' right to present evidence on all material disputed issues." *Id.* at 311. Then, with time up, the "judge abruptly ended the trial in the middle of a witness's testimony." *Id.* On appeal, the court reversed, with no inquiry into prejudice, reasoning: "Whether we call this error 'structural' or not is inconsequential. The failure to accord a party litigant his constitutional right to due process is reversible per se, and not subject to the harmless error doctrine." *Id.* at 312; *accord* Sims v. ANR Freight Sys., Inc., 77 F.3d 846, 849 (5th Cir. 1996) ("When the manner of the presentation of information to a jury is judicially restricted to the extent that the information becomes incomprehensible, then the essence of the trial itself has been destroyed."); Gonzalez v. Gonzalez, No. B253352, 2015 WL 1181245, at *2 (Cal. Ct. App. Mar. 13, 2015) ("[C]ourts have consistently applied the rule of automatic reversal where a party is prevented from having his or her full day in court." (internal citation omitted)).

collects, compiles, and disseminates detailed statistics on federal case filings, terminations, and trial activity, should begin collecting these relevant statistics.[317]

CONCLUSION

On one level, this Article simply aims to put trial time limits under the microscope. I have shown what trial time limits are, how they work, and where they come from—and I have analyzed whether these restrictions are, on balance, a good or bad thing. Breaking with most scholars and jurists who have lauded trial time limits, I have shown that many benefits associated with these controls are dubious, or at least exaggerated, and these restrictions also come with numerous, significant drawbacks, which have, to this point, been overlooked. Finally, in this Article's final Part, I have tried to chart a path forward. By offering six discrete recommendations, I have tried to give courts and Rules Committees concrete and practical guidance as they seek to mitigate time limits' drawbacks, while retaining their core advantages.

Yet, on another level I have had a different ambition, and I have been engaged in a broader project. As I noted at the outset, over the past two decades, academics have paid a great deal of attention to the "disappearance" of the American civil trial. At the same time, academics have paid surprisingly little attention to the *remaining trial's* simultaneous marginalization and metamorphosis. Above, I show that trials aren't just becoming rarer. They are also, it seems, becoming shorter, more regimented, subject to less party control, and more affected by particular judicial whims. Critically, too, this is hardly the last word. Further study from a different vantage point may confirm or cast doubt on those conclusions—and will no doubt reveal that trials are evolving in other ways, too.

As the number of trials dwindles, the few trials left have an outsized and ever-larger effect—when it comes to enforcing laws, setting precedent, establishing settlement rates, promoting transparency, and, more broadly, shaping Americans' interactions with, and conception of, the civil justice system. It is therefore not enough to know what is happening in lieu of trials, before trials, or after trials. We must also roll up our sleeves and carefully study the dynamics and decisions that shape the civil trial itself.

---

317. Of course, also obtaining this information from state courts would be ideal—but such data collection would pose daunting logistical challenges.